## McKinnon *v.* McKinnon *et al.*

*(Circuit Court, W. D. Missouri, St. Joseph Division.* July 20, 1891.)

1. **WILLS—TESTAMENTARY CONTRACT—VALIDITY.**
   An uncle and nephew entered into partnership in the practice of medicine. The written articles of copartnership provided that, should the uncle die, "all his property, personal and otherwise, which he held in partnership at the time of his death should go to" the nephew. The articles were not executed in the manner required for wills. *Held,* that land which had been bought by the uncle in his own name did not on his death pass to the nephew, since the instrument was clearly testamentary.

2. **SAME—STATUTE OF FRAUDS.**
   Before the execution of the written articles of copartnership the parties had made an oral agreement of a similar character. *Held,* that under the statute of frauds the agreement was ineffective to pass title to the uncle's land.

3. **EQUITY PRACTICE—PLEADING AND PROOF.**
   Upon a bill brought by the nephew after the uncle's death for a specific performance of a contract, the nephew was allowed by the defendants to testify in his own behalf. The evidence tended to show that part of the land had been paid for with partnership funds. *Held,* that court should not retain the case for an accounting and the enforcement of a resulting trust, since the nephew's testimony had been admitted on the theory that the only issue was as to his right to a specific performance.

In Equity.

This is a bill for specific performance. The bill in substance recites that on the 1st day of January, 1882, one Malcolm McKinnon, (who was the uncle of complainant, John A. McKinnon, and then engaged in the practice of medicine at Maysville, Mo.,) formed a copartnership with the complainant at said place in the practice of medicine; that at said time Malcolm owned in fee a certain parcel of land as residence property, of the value of $1,000; that it was agreed at the time of the formation of the partnership that this real estate should be the property of the partnership, and that the profits arising from the business and practice of the firm should be from time to time invested in real estate, to be used for the purposes of the partnership; that in 1882 they purchased a farm known as the "Watts Farm," which was paid for out of the earnings of the partnership business, although the deed of conveyance thereto was taken in the name of the uncle. It is further alleged that, both parties being unmarried, it was agreed between them, "for certain valuable considerations in said agreement expressed, that, should the said Malcolm die during the continuance of said partnership without leaving a family of his own, then all the property of the partnership, of every kind, should go to and become the property of the complainant." That on January 1, 1884, the parties concluded to put their agreement in writing, which was accordingly done. The important parts of this agreement are as

follows: *First.* It recites that this agreement is made on "this the 1st day of January, 1884." They agree "to enter into partnership, for the purpose of practicing the arts of medicine and surgery, in the town of Maysville and vicinity, from the 1st day of January, 1884, until the 1st day of January, 1890, inclusive." *Second.* They were to share equally the profits, as also the expenses and losses. At the end of the partnership, at the request of either, they were to take account of stock and all profits in money, or any other property of which they were in possession, "and, after deducting therefrom all expenses of the firm, and allowing for the differences in stock furnished at the commencement of the partnership, equally divide all profits, which we will consider due to ourselves, our heirs, or executors." *Third.* The junior member, at the end of the partnership, agreed to relinquish the right to practice at Maysville without the consent of the senior member. *Fourth.* "And it is further agreed upon that, should the senior member die, or become incapable of practicing his profession, the right to continue the business should devolve upon the junior member; and, in the event of the death of the senior member, all his property, personal and otherwise, which he held in partnership at the time of his death, should go to the junior partner, provided the senior member leaves no family of his own to which it might recur." *Fifth.* Makes provision concerning the matter of administering the property in case of the death of the junior member. This partnership continued until the death of the uncle, which occurred on the 14th day of May, 1886. He was 44 years old at the time of his decease. On March 23, 1885, another piece of real estate was acquired, as is alleged, with the partnership funds, known as the "Meyers Lots." The deed to this property was also taken in the name of the uncle. The uncle died unmarried, leaving the respondents, and others, not parties to this action, his heirs at law. The respondents having brought action of ejectment against the complainant for the recovery of their interest in the property,—the real estate,—the complainant filed this bill in equity in the nature of a cross-bill to enjoin the prosecution of the action at law, claiming that by the terms of the agreements aforesaid he was the absolute owner in equity of the entire property, and praying for the specific performance of the contracts, and the divestiture of the legal title of the heirs of Malcolm McKinnon in and to the said real estate, and the vesting of the same in him, etc. The evidence showed that the uncle had long been established in the practice of his profession at Maysville, Mo., prior to 1881. At that time the complainant was a young man, just graduated in medicine, and had been practicing in the state of Massachusetts about one year. He had no property, save his medical instruments, and perhaps a few books. At that time the uncle wrote him respecting his practice in Missouri, which was promising, suggesting to the nephew the advisability of his coming to Missouri and engaging with him. He concluded to do so, and arrived at the uncle's home in the fall of 1881. At that time the uncle had in bank about $1,200 in money, a large amount of outstanding accounts, and an equipment of horses, buggies, and other vehicles, in addition to the residence property above

named. Their card for the practice of medicine appeared in the newspaper about the 1st of January, 1882. What the terms of their co-operation were we are left alone to ascertain from the statement of the nephew made on this trial. His claim is that all the uncle had of real estate, money, and other property went into the partnership business as a common fund, and that all the property acquired after that time took the same direction and character, with the agreement that on the death of the uncle during the continuance of the partnership the entire property should go to the nephew by survivorship. The personal estate amounted to about $3,500, which was administered upon and appropriated by the complainant. Other evidence will appear from the opinion.

*Steven S. Brown*, for complainant.

*Lancaster, Hall & Pike*, for respondents.

PHILIPS, J., (*after stating the facts as above.*) This is what may not inaptly be termed a many-sided case. There are, however, a few controlling principles of law which so far determine the case as to render, in my opinion, an extended review of the evidence unnecessary. There are involved three pieces of real estate. One is known as the "Residence Property," acquired and owned by the uncle, Dr. McKinnon, Sr., long prior to the complainant's coming to Missouri; the farm known as the "Watts Farm," acquired in 1882, after the formation of the partnership by parol; and the Meyers lots, acquired on the 23d day of March, 1885, after the formation of the partnership, under written articles of agreement of January, 1884. As to the lot known as the "Residence Property," it may as well be said here as elsewhere that there is no foundation for the suggestion that the claim made to that by complainant can be supported upon the consideration that the complainant left his home in the east and moved to Missouri on the faith of the assurance that he was to have this property. The bill itself makes no such claim. The only negotiation between the parties was by letters, as claimed by complainant; and, accepting his own version of their contents, (the letters not being produced,) there was no reference made to this real estate. The only thing named was the extent and character of the professional practice of the uncle. It was on the faith of that alone he come to Missouri. He made up his mind to come solely on account of the proffered interest in the practice of medicine. He did not, so far as his testimony discloses, even know of the existence of this property until after his arrival here. The bill is framed for and on the theory of a specific performance. He must, therefore, show a parol contract, clear, explicit, and indubitable in its terms, based upon a valuable consideration, fully performed or paid by him. Without objection to his competency, the complainant was introduced as a witness in his own behalf. Justice to the dead demands not only that the complainant be held rigidly to his own version of the terms of the verbal agreement, but, as he is attempting to affect the title to real estate by the uncertainty of parol proof and his rehearsal in his own behalf of the words and conduct of a dead man,

every reasonable intendment of fact, in the forum of conscience. should be indulged against him. The very utmost that can be predicated of his testimony respecting the home property is that it was understood it was to go into the partnership arrangement. On what basis of valuation, as between partners, it was to be estimated, is not apparent, from the vague and general terms testified to by the complainant. As already suggested, the bill is framed on the theory of specific performance, as if the complainant were entitled in equity to the entire property, whereas the complainant's testimony only tends to show that this property constituted a partnership asset. On the theory of partnership, no matter in whose name the legal title stood, in equity the realty would be treated as a partnership fund, "disposable and distributable accordingly." And in case of the death of one of the partners there is no right of survivorship; but, after payment of debts, his share would go, according to a strong line of authorities, to his legal representative, or, according to the better rule, to his heirs at law. The right of the heirs and distributees would be postponed to that of the partnership creditors, and where there are no partnership debts such property would be held in equity for the adjustment of balances on an accounting between the partners. The residuum would go to the administrator or the heirs at law. 1 Story, Partn. §§ 92, 93; 1 Woerner, Adm'n § 126; *Buchan* v. *Sumner*, 2 Barb. Ch. 167. The administration of the partnership estate having been concluded, the surviving partner is not entitled to hold this property even in trust. To maintain this bill, therefore, the complainant is necessarily driven to the contention that the partnership agreement provided for an absolute survivorship in him as to this property. When he first undertook in his deposition to detail the verbal agreement he went no further than to state, in substance, that the uncle proposed to put into the partnership whatever he owned of personalty and realty, without any limitation as to either the term of the partnership or final disposition of the joint estate. His learned counsel, recognizing the legal predicament in which this would leave his cause under the bill, plied the complainant with an exhausting pump. After several questions as to what transpired between the parties in their personal interviews after the complainant reached Missouri, his counsel asked: "What did he tell you he would do?" The complainant answered, seemingly, in full, stating the terms of the contract, without intimation that the uncle said he would make him his heir. Thereupon this question was put: "Was anything said about the final disposition of this property in any contingency?" To this the answer came: "He said, in one of our first conversations we had in talking about home affairs, and one thing and another, that if I would stay with him there, we would work together,—we would accumulate together; 'I will consider you in the light of my heir, and what we make will be considered as yours. I want it to go that way.'" Aside from the fact that it thus appears that the witness himself did not at first deem this suggestion as to the final disposition of the property a part of or one of the terms of the contract of copartnership, it is quite inferable from the cross-examination that this conversation in point of time

was after the partnership was consented to by the complainant. This conclusion is justified by the following questions and answers:

"*Question.* You regarded then, did you not, your uncle's offer to make you his heir as a free offering on his part? *Answer.* No, not altogether. It was free in the sense of his giving it, but was not free in the sense of not receiving an equivalent. *Q.* Explain what you mean by that. *A.* In this way: Of course it was his to withhold, but, while that was the case, it was to his interest both financially, and, I suppose, socially, that I remain, because he was unable to do the real hard work of the practice. *Q.* You were perfectly willing, however, to remain at the time he made the offer, were you not? *A.* Yes, sir."

It cannot, therefore, be fairly maintained that this was a promise based upon the consideration of the formation of the partnership. On the contrary, the context, as well as the time and the occasion of the utterances, enforce the conclusion that it was of the nature of a gratuitous promise, as distinguished from a promise based upon a valuable consideration. "The question in such a case is always: Were the representations made by the decedent terms in a contract, or were they merely voluntary, revocable promises, which were not carried out? Did the complainant drive a bargain with him, or did he trust to his generosity, relying upon his word?" 5 Amer. & Eng. Enc. Law, 313. The context shows that this conversation came about casually. They were "talking about home affairs, and one thing and another. I will consider you in the light of my heir, and what we make will be considered as yours. I want it to go that way." This is no more than a mere testamentary intention. "I want it to go that way" expressed no agreement, and bound the uncle to nothing. It was simply the declaration of a wish, with none of the ear-marks of a contract. The complainant having already come to Missouri upon the prospect of a profitable partnership, to an inexperienced and impecunious young doctor, and having already consented to the partnership, he was really to perform no additional act, nor give any additional consideration, for this promise. In *Neal's Ex'rs* v. *Gilmore*, 79 Pa. St. 421, the decedent, having no children, took two boys of tender years to live with him. A short time afterwards one House, a half-brother of the complainants, met the decedent, and he testified that the decedent had taken a great liking to the children, and that he would like to keep them; and, if their father would stay and work the place, and behave himself, he would give him a certain share of the crop; and, if the children would stay until they were of age, he would take them, and raise them as his own; that he would give them a good common education, and at his death would give them what he had. It was held that this was a mere declaration of intention of the decedent towards the children; that it had none of the marks of a contract. It was a contract all on one side; and in determining whether it was a contract or not it is a controlling circumstance that all the important benefits were on the side of the promisee.

In addition to all which it is not clear to my mind that the alleged verbal contract respecting the home place is not within the prohibition of the statute of frauds. "No action shall be brought upon any con-

tract made for the sale of lands, * * * or an interest in or concern-ing them, * * * or upon any agreement that is not to be performed within one year from the making thereof, unless the agreement upon which the action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith." Section 5186, Rev. St. Mo. "All declarations or creations of trust or confidence of any lands, etc., shall be manifested and proved by some writing signed by the party, * * * or by his last will in writing, or else they shall be void." Section 5184, Id. In *McCormick's Appeal*, 57 Pa. St. 54, it is expressly held that a parol agreement made in an-ticipation of the formation of a partnership to put land into the firm, or to consider it as firm property, passes no title, either in law or equity. The court say that—

"A taking possession does not withdraw a parol contract from the statute of frauds. The possession taken under such a contract must not only be no-torious and distinct, but it must be exclusive of the vendor. Receiving a parol vendee into joint possession with his vendor is not equivalent with the ancient feudal investiture, for which the statute of frauds intended to declare a writing should be the only substitute. The notoriety and significance of an entry into common possession is much less than when an owner leaves and another person takes the sole and exclusive enjoyment. Hence it has been held that a tenant in common in possession cannot pass his title to his co-tenant in possession by parol, because there cannot be, in such a case, that distinct transfer of possession which equity regards equivalent to a written contract. To constitute a valid parol sale under the statute of frauds, the possession must be exclusive of the donor. * * * The mischief against which the statute was designed as a guard is greater in cases of parol trans-fers to partnerships than in any other case. * * * When partners intend to bring real estate into partnership, their intention must be manifested by deed or writing placed on record, that purchasers and creditors may not be deceived. * * * Undoubtedly a partnership may hold real estate, and they may have a resulting trust, where the partnership funds have paid for land. *Erwin's Appeal*, 39 Pa. St. 535. So there may be a constructive trust in favor of a firm, as was held in *Lacy* v. *Hall*, 37 Pa. St. 360; but these come within the exceptions to the statute of frauds. In both these cases the lands were acquired after the partnerships had been formed, and while the joint business was in progress. But here there is no resulting or construct-ive trust. The agreement, if there was any, to put the land into the joint stock, was made before the firm had any being, and the partnership funds did not pay for it. A parol agreement to put land into a firm, or to consider it as firm property, made before the firm exists, is wholly ineffectual to pass any title, either in law or in equity."

The rule invoked by counsel for complainant, that a complete per-formance of the contract on the one side may take the case out of the operation of the statute, in my opinion, has no application to a case like this. The courts have gone quite far enough in this direction, practically wiping out the wise and protective provisions of this statute by equita-ble construction. The rules laid down by the supreme court in *Purcell* v. *Miner*, 4 Wall. 513, may well be applied to this case: The party re-lying upon such parol contract must make full, satisfactory, and indu-bitable proof of the contract,—a proof which must show a contract leav-

ing no *jus deliberandi*, or *locus pœnitentiæ*, and which cannot be made out by mere hearsay, or by evidence of the declarations of a party to mere strangers to the transaction, in chance conversation, that the consideration has been paid. And even this will not of itself be sufficient for the interference of a court of equity, if the party have a sufficient remedy at law to recover back the money, or after there has been such part performance of the contract that its rescission would be a fraud on the other party which could not be compensated by damages; and, finally, that delivery of possession has been made in pursuance of the contract acquiesced in by the other party.

In respect to the property known as the "Watts Farm," acquired by the uncle in 1882, the complainant's evidence shows that at least $1,000 or $1,200 of the purchase money was paid out of the moneys of the uncle on hand when the complainant came to Missouri; and the uncle gave his notes for the unpaid balance, which the complainant testifies was paid out of the earnings of the joint practice. The negotiation for the purchase of this farm was conducted wholly by the uncle, and the deed taken in his name. This fact was known to the complainant, without protest or inquiry on his part. In view of the attempt to impress the title to this land with a trust by calling strangers as witnesses, to give rather their impressions than the words of the conversations had with the deceased, to the effect that he spoke of this land as if held for the use of the firm, the letter written by the uncle to his brother in 1883 constitutes more than countervailing evidence. It was written in the abandon of confidence between two brothers. It was written at a time when the writer could have had no conceivable object to either pretend or dissemble. In his letter he said:

" I bought a farm lately, and it keeps me cramped to make the payments on it, and I want to be as saving as I can. I thought it best to have such a provision made, as I might get crippled, and unable to attend to my profession. You know a doctor runs a good many risks, riding at all times."

This language is hardly consistent with the testimony of the expectant "heir" that this purchase was made as a mere investment of the surplus earnings of their practice. "I thought it best to have such a provision made, as I might get crippled," etc., coupled with other evidence that the uncle spoke of this farm as a place of repose, and the attention he was giving to stocking it, furnish little support to the contention of the nephew that it was bought as a joint investment, to be held as a mere partnership asset. On the contrary, the inference is strong that the uncle made this purchase with the pleasing expectation that with advancing age he would in the near future leave to his *protege* the legacy of the practice he had built up, with its good-will, and retire to the more peaceful pursuit and quietude of agricultural life. Especially would this be a happy provision in the event of the happening of the apprehended physical misfortune. It would be a liberal concession to the complainant to say that a part of the purchase money of this farm came from the earnings of the professional practice of the firm. What, then, would be the rights and interests of the complainant in this farm? In the absence of

debts to be paid out of the partnership assets there would be a resulting trust, not in favor of the complainant, but in favor of the partnership, creating a charge upon the land *pro tanto*. *Botsford* v. *Burr*, 2 Johns. Ch. 410. And this resulting interest would be subject to an accounting between the partners; and, even if the case were to fall within the view that the entire balance of the purchase money was paid by the complainant, it would be subject to a further serious legal impediment. Where A. asserts a resulting trust in his favor to land deeded to B. on the ground that he paid part of the purchase money, such money must be advanced at the time of the original transaction, and not after the purchase is consummated. In *Botsford* v. *Burr*, *supra*, the chancellor, speaking of the note assigned by the complainant in payment of a part of the purchase money, said:

"The note affords no ground for a resulting trust springing out of the purchase of either farm by the defendant, because such a trust arises only from the payment, originally, of the purchase money, (or at least a part of it,) by the party setting up the trust. * * * The trust must have been coeval with the deeds, or it cannot exist at all. After a party has made a purchase with his own moneys or credit, a subsequent tender, or even reimbursement, may be evidence of some other contract, or the ground for some other relief, but it cannot, by any retrospective effect, produce the trust of which we are speaking. There never was an instance of such a trust so created, and there never ought to be, for it would destroy all the certainty and security of real estate. The resulting trust, not within the statute of frauds, and which may be shown without writing, is when the purchase is made with the proper moneys of the *cestui que trust*, and the deed not taken in his name. The trust results from the original transaction, at the time it takes place, and at no other time; and it is founded on the actual payment of money, and on no other ground. It cannot be mingled or confounded with any subsequent dealings whatever." *Vide Ducie* v. *Ford*, 138 U. S. 587, 11 Sup. Ct. Rep. 417.

So the only possible pretext upon which the complainant could assert a resulting trust in his favor is upon the assumption that the $1,000 paid by the uncle on the original purchase belonged to the partnership assets. This pretension rests alone upon the unsupported testimony of the complainant, which, under all the circumstances concerning the relations between these parties and the purchase of this farm, I cannot accept as sufficient to impress the legal title to this property. His own testimony respecting this purchase is that when the uncle made it and paid the $1,000 he stated to the nephew, "We must now collect up to raise the balance." This was nothing more nor less than an agreement at the time of the purchase and conveyance that part of the purchase price might be paid after the original act, and as such it is within the statute of frauds; or, if paid out of the partnership funds, at the very utmost it would only create a charge upon the land *pro tanto* in favor of the partnership.

In respect to the Meyers lot, acquired after the execution of the articles of agreement of partnership of January 1, 1884, if it is to be treated as partnership property, it is clearly subject to the terms of the written instrument. The contention of the complainant is that the entire purchase money came from the partnership funds. If this purchase was made pursuant to and in furtherance of the copartnership, there would be a

resulting trust in favor of the partnership, subject to the equitable interests hereinbefore stated. After the administration of the partnership assets and payment of partnership debts it would be subject to an equitable accounting as to the balance between the partners; and, probably, under the Missouri statute doing away with joint tenancies, the surviving partner and the heirs at law of the deceased partner would be tenants in common in the real estate. *Buchan* v. *Sumner,* 2 Barb. Ch. 198; *Carlisle* v. *Mulhern,* 19 Mo. 57; *Willet* v. *Brown,* 65 Mo. 138. In the absence of any question as to the rights of creditors of the concern, in construing the rights and interests of the partners *inter se* respecting this purchase, their intention in making the purchase would have to be looked into. The articles of agreement provided only for a partnership "for the purpose of practicing the arts of medicine and surgery." As this purchase of the Meyers lot, unless used in connection with the business of the concern, for an office, or something of that character, does not come within the purview of the written instrument, it would be regarded as a mere commercial transaction, the investment of surplus funds; and the parties might in such a case be mere tenants in common. The better rule seems to be that which makes the intention of the parties, as between themselves, at the time the conveyance was taken, the proper test. If they intended to make a division of that portion of the assets they would be tenants in common. If they intended to keep it in the firm, employing it as an asset, it would be a partnership asset. See note to *Page* v. *Thomas,* 54 Amer. Rep. 793. The ultimate reliance of the complainant for the retention of the whole of the real estate and for the divestiture of the legal title is based upon the following declaration in the written articles of agreement:

"And it is further agreed upon that, should the senior member of the firm die or become incapable of practicing his profession, that the right to continue business should devolve on the junior member, [J. A. McKinnon;] and in the event of the death of the senior member of the firm, that all his property, personal and otherwise, which he held in partnership at the time of his death, should go to the junior partner, [J. A. McKinnon,] providing the senior member leaves no family of his own to which it might recur."

It is to be observed that the property thus designated to go to the complainant on the death of the uncle is expressly restricted to that "which he held in partnership at the time of his death." As every species of property held by the uncle, according to the testimony of the complainant, was either held in copartnership or in trust for the benefit of the partnership, why did the parties to this agreement employ the term, "held in partnership?" If it was the understanding of the parties and the intention of the uncle to leave it to the "junior member," the most natural, as the most apt, term possible would have been, "all his property, personal or otherwise, which he held at the time of his death." The limitation, on the contrary, not only indicates that the senior member held other property than partnership, but that it was his mind to give none other than his interest in the partnership property. To give any other construction to the written instrument is to add to its expressed

language, and to substitute the wish and hope of one of the parties for the expressed will of the other. Superadded to all this, the provision of the agreement was not only to take effect after the death of the uncle, but was to apply alone to the property held by him in partnership at the time of his death. The well-settled rule of law is that an instrument purporting to be a deed or contract transferring property after death is but a testamentary paper. In determining whether it be a conveyance or a will the court will not consider so much what the maker believed it to be, but what in point of law it is. *Hester* v. *Young*, 2 Ga. 31; *University* v. *Barrett*, 22 Iowa, 73, 74; *Watkins* v. *Dean*, 10 Yerg. 320. The essence of the definition of a will is that it is a disposition to take effect after death; and, whatever the form of the instrument, if it passes no present interest, but only directs what is to be done after the death of the maker, it is testamentary. *Turner* v. *Scott*, 51 Pa. St. 126. If the instrument passes a present interest, although the right to its possession and enjoyment may not accrue until some future time, it is a deed or contract; but, if the instrument does not pass the interest till after the death of the maker, it is merely testamentary. *University* v. *Barrett, supra.*

In *Roth* v. *Michalis*, 125 Ill. 325, 17 N. E. Rep. 809, the court say:

"The instrument, it will be observed, does not, as counsel assume, purport to convey an undivided half of the property which he then owned; but, on the contrary, only that which he might leave at the time of his death, after the payment of all his just debts. What portion of the effects he then owned, if, indeed, any at all would be on hand at the time of his death, and thus brought within the terms of the grant, was at that time, as is manifest, a matter of pure conjecture. This being so, it is clear that no present estate or interest in the property thus owned by him could have passed by this deed, and it therefore follows as a legal sequence that the instrument in question, considered as a conveyance, was and is void. This conclusion rests upon the fundamental principle that a deed takes effect upon its delivery, if at all."

The court then proceeds to consider the question as to whether such a provision can be given effect to as a declaration of trust:

"It is unquestionably true that, where one for a valuable consideration attempts to make a conveyance of property to another, and by some casualty or inadvertence the instrument is defective and inoperative as a conveyance, a court of equity will, in a proper case, treat the instrument as a declaration of trust, or as a contract for a conveyance, as the circumstances may require. But this doctrine has no application to a case like the present, where an essential element of the trust is wanting. An existing property right in or to some distinct subject-matter is essential to the existence of every trust; and any instrument, however perfect otherwise, which fails to disclose this, cannot properly be established as a declaration of trust."

See, also, following authorities: *Miller* v. *Holt*, 68 Mo. 584; *Grattan* v. *Appleton*, 3 Story, 755; *Sperber* v. *Balster*, 66 Ga. 317; *Turner* v. *Scott*, 51 Pa. St. 126; *In re Diez*, 50 N. Y. 88; *Cover* v. *Stem*, 67 Md. 449, 10 Atl. Rep. 231; *Reed* v. *Hazleton*, 37 Kan. 321, 15 Pac. Rep. 177; 1 Redf. Wills, 170.

We do not controvert the doctrine that a contract, based on a valuable consideration, duly performed by the beneficiary, to make a will,

may be specifically enforced or compensated in damages after the death of the promisor. But, as we have already shown in respect of the alleged verbal language, "I will make you my heir; I want it to go that way," this promise was a mere gratuity. This view the complainant should be held to, for the reason that in his cross-examination he stated in the most direct terms that the parol agreement of 1881 was but, in effect, transferred to and expressed in the written instrument of 1884; that it, according to his understanding, differed in no material respect from the written agreement. So the conclusion forces itself that this provision of the written instrument was a mere gratuity,—a provisional arrangement as to the final disposition of his partnership interest in the event of death during the continuance of the partnership. It was certainly revocable by the act of the uncle during life. Had he, by will or other instrument, disposed otherwise of this interest, what remedy would the survivor have had to prevent it? This provision of the agreement could not have been specifically enforced, as the property would not have been in the uncle's possession at the time of his death. There could have been no action in *assumpsit* predicated of the breach of contract, for by its explicit terms the junior member was to take only in the event the uncle held the property at the time of his death. He was not required to hold it until that event. On the contrary, the second article of the agreement provided for a disposition of the partnership property by division on dissolution of the partnership prior to death. There was no restraint of the power of disposition prior to death; therefore the alleged contract passed no interest *in præsenti*, nor created any *indebitatus assumpsit*. The promise, then, was essentially testamentary. As such it must fail, for the reason that the instrument does not conform to the requirements of the Missouri statute prescribing the necessary formality in the execution of wills. Section 8870, Rev. St. Mo.

Of the testimony of witnesses called by complainant to depose concerning statements made by decedent in promiscuous conversations, to the effect that he and his nephew owned the property in common, and the like, it may be observed—*First*, that such desultory talk cannot be accorded more weight than the complainant's own version of the understanding between him and the deceased; and, *second*, that such vague and indefinite statements are too meager to be the basis of judicial ascertainment of the exact state of accounts, or terms of compact, between the parties. Such evidence is often easy of coinage against the dead, or, when honest, owing to the weakness of human nature to favor the "living king," it enlarges by excessive coloring. As aptly said by Sir WILLIAM GRANT, (*Lench* v. *Lench*, 10 Ves. 517:)

"The witness swears to no fact or circumstance capable of being investigated or contradicted, but simply the naked declaration of the purchaser admitting that the purchase was made with the trust money. That is, in all cases, most unsatisfactory evidence, on account of the facility with which it may be fabricated, and the impossibility of contradicting it. Besides, the slightest mistake or failure of recollection may totally alter the effect of the declaration."

The only written declarations through which the uncle, "though dead, yet speaketh," are the deeds, his letter to his brother, the articles of co-partnership of 1884, and his notes for the unpaid purchase money for the lands. Against these the only claim which this evidence presents of a disputable character, to my mind, is whether or not there is a resulting trust in favor of the partnership against the Watts farm to the extent of the money, if any, taken from the partnership funds to complete the payments, and the extent and nature of the claim in favor of the partnership, and the residuary interest of the complainant in the Meyers lots. Should the court retain the bill for the purpose of making this ascertainment? It is true, a court of equity, as a rule, may grant any relief under the general prayer consistent with the allegations of the bill. But the bill in this case is not framed with a view to either treating this property as a partnership asset, nor as chargeable with a resulting trust, nor as an equitable tenancy in common. The evidence was not taken with a view to the settlement of partnership accounts, the ascertainment of balances, nor the exact amount of the trust funds which are claimed went into the purchase of the respective pieces of property. And what is more persuasive still that under this bill and the depositions published thereunder the court should not undertake to vary the theory of the complaint is that the respondents have consented, under the issues presented, to admit the deposition of the complainant himself. What their action would be, under their unquestionable right, in admitting this testimony on another theory, the court cannot anticipate. So long as the object of pleading is to define the issues between the parties, to advise them to what matters witnesses are to be called, the relief asked for by the pleader ought to have controlling influence. The complainant is not entitled, in my opinion, to a decree for specific performance. It is therefore ordered that the bill be dismissed, and the injunction dissolved, at complainant's costs.