ROBERT C. CHAMBERS, APPELLANT, *v.* SUSAN B. EMERY, ADMINISTRATRIX OF ALBION B. EMERY, DECEASED, RESPONDENT.

RESULTING TRUST—ESTABLISHMENT BY PAROL TESTIMONY—CHAR-
    ACTER OF EVIDENCE REQUIRED—ADMISSIONS—STATUTE OF
        FRAUDS—TRIAL—FINDINGS—EVIDENCE.

1. C. Claimed that he furnished money to E. under and pursuant
    to a parol agreement that C. and E. should as a joint en-
    terprise and adventure, but in the name and through the
    agency of E., purchase an interest in certain mining prop-
    erty, and thereafter, in the name of E. and in connection
    with their co-owners in the property, work the leased
    property for their joint benefit, and at their joint risk.
    *Held*, that if property be purchased under such an arrange-
    ment, it will create a resulting trust, which will not be
    affected by the statute of frauds.

2. *Held*, further, that in such case, he who furnished the money
    becomes the *cestui que trust*, and the holder of the legal
    title the trustee, and that the trust may be proved by parol
    evidence, even after the death of the trustee.

3. Where a bill in equity seeks to convert a defendant, who pur-
    chased property and had the legal title thereto made in his
    own name by an instrument in writing, into a trustee for
    the plaintiff, upon the ground that the purchaser was acting
    as agent, and that plaintiff furnished the money, the bur-
    den is on the plaintiff to establish, by evidence *dehors* such
    instrument, such facts as will show that the purchaser was
    acting for the plaintiff, and such facts must be inconsistent
    with the idea that the purchaser acted solely for himself.

4. To establish a resulting trust by parol evidence, in favor of one
    who furnished purchase money, public policy and the safety
    and security of titles to real estate demand that the proof
    be scrutinized with great caution, and that it be clear, defi-
    nite, unequivocal, and conclusive. A bare preponderance

of parol evidence is not sufficient. It must show the existence of the trust beyond reasonable controversy.

5. Where it is sought to establish a resulting trust by the aid of admissions of the nominal purchaser, the court will receive and consider the evidence of such admissions with great caution; it being generally of a most unsatisfactory and dangerous kind, and especially is this so when the alleged trustee is dead.

6. Where witnesses, after a lapse of years, testify to conversations had with a person, since deceased, in which, it is claimed admissions were made by the deceased respecting matters in which such witnesses had no special interest, the testimony is obviously weak, and will be closely scrutinized.

7. It is not error for the court to fail to make express findings on issues raised in the pleadings, which have become immaterial during the course of the trial.

8. It is not reversible error for the court to strike out testimony which is too indefinite to aid the case of the party offering it, when no prejudice can result from striking it out.

(No. 620. Decided May 20, 1896. 45 P. R. 192)

Appeal from the district court of the Third judicial district, Territory of Utah. Hon. S. A. Merritt, *Judge.*

Action by Robert C. Chambers against Susan B. Emery, administratrix of Albion B. Emery, deceased, to enforce a resulting trust. From a judgment for defendant, plaintiff appeals. *Affirmed.*

*Bennett, Bradley & Marshall,* and *Williams, Van Cott & Sutherland,* for appellant.

The burden of proof was on appellant to establish the facts upon which the trust rests by clear and satisfactory evidence. 1 Perry on Trusts, sec. 126.

But when the appellant once showed by clear and satisfactory evidence the payment of one-half of the purchase money a presumption of a resulting trust arose,

to the benefit of which presumption he was entitled; the other evidence being pertinent simply as corroborating or rebutting such presumption. Perry on Trusts, sec. 139, vol I; *Dudley* v. *Bosworth*, 10 Humph. 12.

As to the basis of this presumption, Story says: "In truth it has its origin in the natural presumption, in the absence of all rebutting circumstances, that he who supplies the money means the purchase to be for his own benefit, rather than for that of another; and that the conveyance in the name of the latter is a matter of convenience and arrangement between the parties for other collateral purposes." 2 Story Eq., sec. 1201; *Taylor* v. *Miles*, 25 Pac. R. 143; 1 Lewin on Trust, star p. 169.

Even as to the payment of the purchase money: "The certainty required, however, is only such as is sufficient to satisfy the jury [court] of the existence of the trust, and it is error to charge that the 'clearest and most positive proof' must be given. For this purpose all competent evidence is admissible, as the admissions of the nominal purchaser and grantee in the deed, recitals in the deed and other proper documents, and even circumstantial evidence, as that the means of the nominal purchasers were so limited that it was impossible for him to pay the purchase money." I Perry on Trusts, § 137, p. 163; *Neyland* v. *Bendy*, 69 Tex. 711; *Willis* v. *Willis*, 2 Atk. 71.

It has been frequently held that the death of the alleged trustee could make no difference in the competency of oral evidence nor would a conflict of evidence preclude the court from granting relief. *Blodgett* v. *Hildreth*, 103 Mass. 484; *Wilts* v. *Horney*, 59 Md. 584; *Neill* v. *Keese*, 5 Tex. 23 (51 Am. Dec. 746); *Williams* v. *Hollingsworth*, 1 Strobh. Eq. 103 (47 Am. Dec. 527); *Harrisburg Bank* v. *Tyler*, 3 W. & S. 372; *Frederick* v. *Haas*, 5 Nev. 389; *Warren* v. *Adams*, 19 Col. 525; *Kimbrough* v. *Nelrus*

(Ala.) 16 So. R. 617; *Richardson* v. *Taylor*, 45 Ark. 476; *Milner* v. *Freeman*, 40 Ark. 67-68.

There being no statute requiring a writing, the court must arrive at its conclusion from the competent evidence. It is not sufficient to say that after the death of the trustee it is too dangerous to rely on oral evidence and nothing but a written testimony will satisfy the conscience of the chancellor. This is a matter addressing itself to the legislative department of the government and that department has not seen fit to require written testimony in such cases.

The doctrine of resulting trusts rests on the presumed intention of the parties. It is sometimes stated that a trust results from the acts, not from the agreements of parties. But it is more accurate to say that such trust results from the acts of parties interpreted by their agreements. A trust arising by the payment of the purchase money is none the less a resulting trust because it results in accordance with the agreement of the parties. 1 Perry on Trusts, §§ 134-137; *Cotton* v. *Wood*, 25 Ia. 45; 2 Pom. Eq., § 1031.

No greater preponderance of evidence should be required to prove the trust than is required to obtain specific performance of a parol contract with respect to lands. As to such contracts proof beyond a reasonable doubt is never required, nor is mere conflict of evidence of itself a ground for refusing to grant the remedy. Pom. Spec. Perf. of Contracts, § 137.

Yet a mere conflict of evidence necessarily creates opposing presumptions, but does not relieve the court of its duty to seek the truth.

Among other findings in the case the trial court found as follows:

"That all of the issues of fact made by the pleadings in this action and not specifically passed upon in the fore-

going findings are found and determined in favor of the defendant and against the plaintiff." (Abst. p. 32.)

This finding in its wholesale character well illustrates the others. The defenses of laches and the statute of limitations were pleaded in the answer and the foregoing finding is in favor of the defendant on both of these issues. The provision of the statute pleaded was section 201 of the Code of Civil Precedure, the limitation in which is four years after the cause of action accrues. If we examine the account of profits received by Emery and credit as against the earlier items the amounts paid by him to Chambers it will readily be seen that the plaintiff did not ask, nor had Emery retained dividends accruing for nor even three years prior to the institution of the suit. (Abst. p. 107.)

The stock sued for was received by Emery after August, 1892; the suit was instituted September 19th, 1894. So that even ignoring the trust features it is difficult to see how the statute of limitation applies.

But it seems well settled that the statute does not run in favor of a trustee of a resulting trust before the trust is openly repudiated. *Warren* v. *Adams*, 19 Col. 525; *Riddle* v. *Whitehill*, 135 *U. S.* 621; *Cole* v. *Noble*, 63 Tex. 434 (45 Am. Dec. 371); 2 Perry on Trusts, sec. 865, p. 517.

Laches are only imputed where there has been gross negligence or deliberate delay. *Mackall* v. *Casilear*, 137 U. S. 566; *Godden* v. *Kimmell*, 99 U. S. 210; 2 Story's Eq., sec. 1520.

What is diligence or what constitutes a stale equity, are questions which depend upon the facts and circumstances of each case and not upon lapse of time alone. *Paschall* v. *Hinderer*, 28 Ohio St. 568; *Bryan* v. *Kales*, 134 U. S. 135.

The statute of limitations in Utah applies as well to equitable as legal *actions*. The old distinction between

*actions* at law and *suits* in equity is abolished. It was this narrow distinction that caused the courts of chancery to hold that the statute of 21 James I. limiting the time within which *action* could be brought did not affect suits in equity. Assuming that there is a statute of limitations which applies: "The question remains whether in general laches can be relied upon as a bar to a mere dry equitable demand falling within the purview of some or one of the statutes of limitations; and it seems that the legislature itself having prescribed a term of limitation which it deems sufficiently short, the court ought not further to abridge that term." 2 Lewin on Trusts, star p. 873; *Lux* v. *Haggin*, 59 Cal. 268.

But beyond this, laches are never imputed for the period of time during which the right is recognized. The law imputes laches from gross negligence in asserting a right which is denied. Until it is denied there is no negligence in failing to sue.

In *Springer* v. *Springer*, 114 Ill. 553, a case of resulting trust, it is said on this point:

"The appellant has interposed the defense of laches as a bar to the relief claimed in the bill. The land was purchased in February, 1869, and this bill was filed in August, 1876. If appellant from the time of the purchase, had denied that the complainant had any rights in the land, and all the time claimed it as his own property, there might be some ground for relying on this defense. But such was not the case. * * * * * One witness testified that as late as 1875, John Springer told him that he and complainant owned 80 acres of the Otto farm together. This was only a short time before the bill was filed. If the defendant held the land in trust for complainant, admitting complainant's rights to the property, while this state of things continued he could not set up as a defence that complainant was guilty of

laches in asserting his rights to the property." 2 Perry on Trusts, sec. 865; *Reynolds* v. *Sumner*, 126 Ill. 58-70; *Fawcett* v. *Fawcett*, 85 Wis. 332; *Warren* v. *Adams*, 19 Col. 526.

The court erred in sustaining defendant's objection to the question asked the plaintiff as follows: "I will ask you if you have received any money as the result of Emery's interest in the Mayflower lease and the extensions thereof, and if so how much?"

This question did not necessarily call for a fact equally within the knowledge of deceased and the plaintiff. Money might have been received originally from Emery, but through intermediate parties and the plaintiff's receipt thereof not be a fact within Emery's knowledge. The court should have permitted this question to be answered. *Roach* v *Ware*, 71 Cal. 357.

Second compiled laws of 1888, p. 288, provide: "Sec. 3379. Upon a trial of a question of fact by the court its decision must be given in writing and filed with the clerk within thirty days after the cause is submitted for decision. Sec. 3380. In giving the decision, the facts found and the conclusions of law must be separately stated. Judgment upon the decision must be entered accordingly."

The provisions of the California Code of Civil Procedure are exactly similar to the above. Deering's Code of Civil Procedure (vol. 3) secs. 632-4 and notes.

Hayne on New Trial and Appeal, at page 718 (sec. 239), says: "Under the system of express findings on the other hand, nothing is implied, but full findings are required upon every material issue, without any request therefor and without any exceptions on account of defects, and if any material issue is left unfound, it is ground for reversal of the judgment."

In *Soto et al.* v. *Irvine*, 60 Cal. 436, an action of eject-

ment was brought and issue taken on defendant's allegation as to possession when the action was begun, and the court at page 438, says: "There should have been a finding on all the issues. The court should have found whether defendant was possessed of the parcel of land sued for or not. Evidential facts were found by the court and not the ultimate fact of possessed or not possessed. There being no finding on this issue, the decision of the court below is against law."

To the same effect are: *Du Pratt* v. *James et al.*, 61 Cal. 361; *Everson* v. *Mahew*, 57 Cal. 144; *Robinson et al.* v. *The Pittsburg Ry. Co.*, 57 Cal. 417; *Brown* v. *Burbank et al.*, 59 Cal. 535; *Gray* v. *Noon et al.*, 67 Cal. 186; *Wells* v. *Wells*, 7 Utah 68, 24 Pac. 752; *Hannaman* v. *Karrick*, 9 Utah 236; *Poorman* v. *Mills & Co.*, 43 Cal. 324; *DeCelis* v. *Porter*, 65 Cal. 10; *Chandler* v. *People's Sav. Bank*, 65 Cal. 499; *Salisbury* v. *Shirley*, 66 Cal. 228; *Hibberd* v. *Smith*, 67 Cal. 556.

This court has held that the admission of improper testimony in equity cases was not necessarily reversible error in *Salt Lake, etc., Co.* v. *Mam. Min. Co.*, 6 Utah 351, 23 P. 760; *Vic. Min. Co.* v. *Haws*, 7 Utah 515, 27 P. 695.

But even as to the admission of testimony, such rule is erroneous as heretofore pointed out, as the court then proceeds on the old theory of a trial *de novo*, which is not the rule in the modern code states.

But this court has departed from the rule as to the admission of improper testimony not being error in equity cases.

In *Silva* v. *Pickard*, 10 Utah 90, this court said: "This testimony doubtless had a controlling influence in the decision of the case. We think the objection taken to the admission of this testimony before the referee should have been sustained, and that the admission of such testimony was error."

All proper testimony *doubtless* has an effect on the trial

judge, and *doubtless* all improper testimony admitted in the case has an effect; and the converse of the proposition is also true, that all proper testimony excluded from the case is *doubtless* not considered by the trial judge, and *doubtless* all improper testimony included in a case is considered and has its weight.

*W. H. Dickson,* for respondent.

The cases all recognize that the party who undertakes to establish by parol evidence a trust in lands in opposition to the deed or other written evidence of the title, has a task of great difficulty, and he must fail unless his evidence is such as to establish his case beyond all controversy. Public policy and the safety and security of titles require that this rule should be rigidly enforced. In *Midmer* v. *Midmer,* 26 New Jersey Equity, it is said on page 304: "The effort always is, in cases of this class, to overcome and destroy a regular, formal, written title, by showing, by evidence less solemn and trustworthy than the instrument itself, that though the deed says the purchase money was paid by A, and the lands were conveyed to him for his own use and benefit, yet, in truth, he did not pay the purchase money, but it was paid by B, and the conveyance was not made to A for his own use and benefit, but to him in trust for B. To make such an effort successful the law, for the safety of titles, requires that the proof shall be of the most convincing and satisfactory kind. Nothing short of certain, definite, reliable, and convincing proof, will justify the court in divesting one man of title to lands, evidenced by regluar deed, and putting it in another." *Kennedy* v. *Kennedy,* 57 Md. 73; *Johnson* v. *Quarles,* 46 Mo. 423; *Ringo* v. *Richardson,* 53 Mo. 285; *Howland* v. *Blake.* 97 U. S. 624; *Cowles* v. *Bowne,* 10 Page Ch. 535; *Ernham* v. *Chiles,* 1 Brown Ch. cs; *Hearne* v. *Ins. Co.* 20 Wall. 488; *Howland* v. *Blako,* 97 U. S. 626;

*Stock Bridge Iron Co.* v. *Hudson*, 107 Mass. —; *Dalton* v. *Dalton*, 14 Nev. 419; *Bingham* v. *Thompson*, 4 Nev. 224; Story's Equity Juris., sec. 157; *Groves* v. *Groves*, 3 Young & Jarvis, 163; 2 Pomeroy's Eq., sec. 1040; *Crisman* v. *Crisman*, 23 Mich. 217, 221, 222; *Allen* v. *Withrow*, 110 U. S. 119, 130; *Boyd* v. *McLean*, 1 Johns. Ch. 582; *Purcell* v. *Minor*, 4 Wall. 517; *McKinnon*, v. *McKinnon*, 46 Fed. Rep. 713, 718-19; *Mitchell* v. *O'Neal*, 4 Nev. 505, 515; *Nichols* v. *McDonald*, 101 Penn. St. 514, 519; *Testament* v. *Perkins*, 3 Green (Ia.) 209; *Corder* v. *Corder*, 124 Ill. 229; *Freeman* v. *Kelly*, 1 Hoffman ch. 91; *Cowles* v. *Bowne*, 10 Paige ch. 526, 535; *Nevins* v. *Dunlap*, 33 N. Y. 676, 680; *Jackson* v. *Andrews*, 59 N. Y. 244; *Ry. Co.* v. *Babcock*, 3 Cush. 328; II High Injctns., secs. 1106, 1120, 1121.

It is competent to show by the admission of the alleged trustee or by other parol evidence that the purchase money was in fact furnished by the claimant, not as a loan to the nominal purchaser, but as the consideration or purchase price; but the mere declarations or admissions of the nominal purchaser, that he holds the property in trust in whole or in part for the claimant, or that the claimant is interested with him in the property, or that the claimant is the owner of, or entitled to any part or portion of the property, or that he and the claimant purchased the property together, no matter how often such admissions or declarations may have been repeated, are not only insufficient to establish the trust, but they are wholly incompetent as evidence. *Moore* v. *Moore*, 38 New Hamp. 382; *Graves* v. *Graves*, 29 New Hamp. 129, read 141, 142; *Neale* v. *Keese*, 51 Am. Dec. 746. See also *Johnson* v. *Quarles*, 46 Mo. 426; *Lehman* v. *Lewis*, 62 Ala. 129. See vol. 1 Leading Cases in Eq., p. 335; 1 Greenleaf Ev., sec. 200, note " B; " *Boyd* v. *McLean*, 1 Johns. Ch. 582; *Midmer* v. *Midmer*, 26 New Jersey Eq. 306-307; *Johnson* v. *Quarles*, 46 Mo. 423, read 427; *Ringo* v. *Richardson*, 53 Mo.

385, read 395; *Greher* v. *Town of Pittsburg*, 22 Wis. 643; *Hagen* v. *Markstein*, 67 Wis. 493; *Russell* v. *Miller*, 26 Mich. 1, read 16, 20, 21; *Reading* v. *Peeples*, 8 Sergeant & Rawle 484, read 492; *Groves* v. *Groves*, 3rd Young & Jarvis, 163, read 170; *McKinnon* v. *McKinnon*, 46 Fed. Rep. 713, read 723; *Allen* v. *Withrow*, 110 U. S. 119, 130. See also *Testerment* v. *Perkins*, 3rd Green (Iowa) 209; *Corbit* v. *Smith*, 71 Am. Dec. 431; *Lench* v. *Lench*, 10 Vesey Jr. 511; *Printup* v. *Mitchell*, 63 Am. Dec. 258, read 264, 265.

Counsel for appellant have discussed at some length the question of the statute of limitations, and the question of laches.    When the court determined that the $4,000 procured by Emery from Chambers was obtained as a loan and not otherwise, that determination was fatal to the plaintiff's case, and rendered it quite unnecessary to consider the defense of the statute of limitations or that of laches.    Having found that the claim of the plaintiff never had any existence, it would have been idle to have gone further and determined that the plaintiff had been guilty of laches in not sooner prosecuting his pretended claim; and equally idle would it have been to have considered whether or not this claim, which never had any valid existence, was barred by the statute of limitations.

See *Porter* v. *Woodward*, 57 Cal. 535, where it is held that: "In an action of ejectment, if the findings show that the plaintiff never had any title, a failure to find upon the defense of the statute of limitations is immaterial."

In case of a constructive trust, the statute of limitations runs in favor of the trustee; hence when the trustee of leasehold interests takes a renewal in his own name the statute of limitations will run in his favor from the time of such renewal or at least from the time when the fact of such renewal comes to the knowledge of the *cestui*

*que trust.* See Angell on Limitations, sec. 471, note 3; 2 Lewin on Trusts, p. 878; *King* v. *Pardee,* 96 U. S. 90; *Strimpfler* v. *Roberts,* 18 Penn. St, 283, read 295, 302, 303; *Lingelfelter* v. *Rickey,* 62 Penn. St. 123.

As stated in appellant's brief, the statute of limitations in Utah applies as well to equitable as legal actions. But it does not follow therefrom that in a purely equitable action the court may deny relief on the ground of laches or unreasonable delay although short of the statutory period.

See *Calhoun et al.* v. *Millard et al.,* 121 N. Y. 69. On page 83 it is said: "But we apprehend that the period of limitations of equitable actions, fixed by the statute, is not where a purely equitable remedy is invoked, equivalent to a legislative direction that no period short of that time shall be a bar to relief in any case, or precludes the court from denying relief in accordance with equitable principles for unreasonable delay, although the full period of ten years (the statutory period there) has not elapsed since the cause of action accrued."

A mere admission or recognition of a constructive trust made by the trustee to a stranger will not prevent the running of the statute, unless it be made with the intention that it be communicated to the beneficiary, or with the view of influencing his conduct. *Biddell* v. *Brizzolara,* 64 Cal. 354; *Kyle* v. *Wells,* 55 Am. Dec. 555; *Bloodgood* v. *Bowman,* 8 N. Y. 362; Story's Eq. Juris., sec. 1321*a*; *Taylor* v. *Hendrie,* 8 Nev. 243; *Wakeman* v. *Sherman,* 9 N. Y. 85; Wood on Lim., sec. 79 and note; *Fort Scott* v. *Fitchburg,* 112 U. S. 150

In the case of a constructive trust, especially where the property sought to be affected by the trust is of a speculative character, the party asserting the trust must act promptly in the assertion of his rights.

Long delay or laches on the part of one asserting a constructive trust is fatal to a recovery by him. If during the period he has delayed asserting his alleged right, the evidence by which his asserted rights, if unfounded, could have been disproved, has been lost or destroyed, as by the death of the opposing party or his witnesses, a court of equity will refuse relief. See also *Severing* v. *Severing*, 10 Atl. Rep. 193; *Wood* v. *Egan*, 2 Southern Rep. 191; *Jinkins* v. *Pye*, 12 Peters 240, read 253 and 262; *Rogers* v. *Van Nortwick*, 87 Wis. 414; *Anthony* v. *Lefterich*, 3 Rand (Va.) 239, read 246, 248–9, 250, 252; *Groves* v. *Groves*, 3 Young and Jarvis 163, read 172; *Twin Lick Oil Co.* v. *Marbury*, 91 U. S. 587; *Clegg* v. *Edmondson*, 8 De Gex M. & G. 787; 1st Leading Cases in Equity 54, 55, 57 and 58; *Germantown Ry. Co.* v. *Fitler*, 100 Am. Dec. 546, read 551; *Campan* v. *Van Dyke*, 15 Mich. 371, read 378; 12 Am. & Eng. Encl. of Law, p. 546 and note 1 and p. 572.

It is next urged that the court erred in not permitting the plaintiff to answer the following question: "I will ask you if you have received any money as the result of Emery's interest in the Mayflower lease and the extensions thereof, and if so, how much?"

Reference to the Abstract, page 153, shows that it was admitted by plaintiff's counsel, at the time this question was asked and objected to, that whatever money the plaintiff received on account of that interest, he received from Emery. This brought the proffered testimony strictly within the inhibition of the statute, in such case made and provided. (See Session Laws of Utah, 1894, chapter 31, pages 26-7.)

BARTCH, J.:

This is an action, in the nature of a bill in equity, instituted against the defendant, as administratrix of the

estate of her husband, Albion B. Emery, deceased, to establish a resulting trust, in favor of the plaintiff, to an alleged interest in certain mining property, and, because of said trust, to have an accounting of the profits and dividends which had accrued by reason of said interest. The cause was tried and judgment entered in favor of the defendant, denying the existence of the trust. This appeal is from that judgment.

It is alleged, in the complaint, substantially, that Albion B. Emery died June 13th, 1894; that the defendant was the duly appointed and qualified administratrix of his estate; that, on July 13th, 1889, said Emery purchased from one W. H. Bennett a one-fifth interest in what was known as the "Mayflower Lease," which had been made, on January 1, 1889, by the owner of the Mayflower No. 7 Mine; that such purchase was made pursuant to an agreement that the plaintiff and said Emery should, as a joint enterprise and adventure, but in the name and through the agency of Emery, purchase the one-fifth interest in said lease, and thereafter in the name of Emery, and in connection with their co-owners in the lease, work the leased property for their joint benefit, and at their joint risk; that thereupon, to purchase the said interest, pursuant to such agreement, the plaintiff furnished Emery $4,000,—one-half the purchase price; that Emery, acting for the plaintiff and himself, so purchased said interest, paying therefor the sum of $8,000, and agreed to and did hold an undivided one-half of the interest so acquired in trust for the plaintiff; that thereafter, in furtherance of such joint enterprise, Emery, in connection with the co-owners, and with the knowledge and consent of the plaintiff, procured, with the credit and funds of the leasehold ownership, modifications of the terms of the lease, extensions of the terms thereof, and acquired, as appurtenant to the same, and necessary for the mining operations, various rights and privileges to

work and mine adjoining properties, and, as to the undivided one-half interest so procured by Emery, a trust resulted to the plaintiff; that Emery, in his lifetime, and during the continuance of the trust, in common with the other interested persons, operated the leased property, realizing large profits therefrom, and, with the profits thus realized, purchased the Silver King Mine, and other rights and property, and, after operating the same and making large profits, one-fifth of which was received by Emery, conveyed all of their property, acquired in manner aforesaid, to the Silver King Mining Company, a corporation organized by them under the laws of Utah, and in consideration of such conveyance took and received all the capital stock of the corporation, Emery receiving and holding, to the time of his death, 24,800 shares thereof, being the same as the defendant now holds as administratrix; that the plaintiff consented to the acts of Emery in acquiring the Silver King Mine and other property for their joint adventure; that large profits were made from the property, and dividends declared and paid to the stockholders; that the amount of such profits and dividends, received by Emery in his lifetime, and by the defendant as administratrix, equal the sum of $117,425.15, one-half of which was received in trust for the plaintiff; that Emery, on account of the profits and dividends, paid the plaintiff various sums, aggregating $20,400, but no other part of the same had been paid to him; that, in his lifetime, Emery did not, and the defendant now refuses to, deliver to plaintiff any shares of the capital stock; and that, after the plaintiff had presented his claim, as provided by law, to the defendant, as administratrix, it was rejected and disallowed by her. The prayer is for a declaration of the alleged trust, for an accounting of the profits and dividends, for a delivery by the defendant to

the plaintiff of 12,400 shares of the capital stock, and for all proper relief.

The defendant, in her answer, admits the purchase by Emery of the one-fifth interest in the Mayflower lease on the 30th of July, 1889, for the sum of $8,000; the continued working and operating of the leased property by Emery and his co-owners; the acquisition, by Emery and his co-owners, of extensions of the term of the lease, and the procuring of modifications and alterations of its terms and conditions; the acquiring, by lease, of various rights and privileges concerning other adjacent mining property; the receipt of large profits from the said mining operations; the purchase of the Silver King Mine and other adjacent property with a portion of the profits; the conveyance of all said mining property to the Silver King Mining Company in consideration of all its mining stock, Emery receiving 24,800 shares thereof, which the defendant now holds as administratrix; and admits the receipt of large profits by the corporation, from the operation of its property, which were paid as dividends on the capital stock,—Emery, in his lifetime, and the defendant, as administratrix, receiving as such dividends, various sums, aggregating $115,500. It is denied in the answer, that Emery purchased the one-fifth interest in the Mayflower lease pursuant to the agreement set up in the complaint, or any such agreement between him and plaintiff; or that the plaintiff furnished Emery $4,000, or any sum, to make such purchase, pursuant to any such agreement; or that Emery, in making the purchase, was acting for the plaintiff, pursuant to such agreement or otherwise; or that said interest was at all purchased pursuant to such agreement. On the contrary, the answer avers that the $8,000, and the whole thereof, used by Emery to purchase said one-fifth interest, was his own money, and that

he made the purchase for himself solely, and that, in his lifetime, Emery never recognized any trust whatever, in favor of the plaintiff, in or to any portion of said interest. Every allegation in the complaint which tends to show that the plaintiff ever had any interest in any of the property in question, or in the capital stock of the Silver King mining corporation, or in any of the dividends or profits arising from the said mining operations, is specifically denied. So, likewise, it is denied that any portion of the profits or dividends mentioned in the complaint as having been paid to or received by Emery, in his lifetime, was paid by him to the plaintiff, pursuant to the alleged agreement.

Under the issues thus formed, the plaintiff has endeavored to establish a resulting trust in his favor, entitling him to one-half interest in the property acquired by Emery through the purchase of the one-fifth interest in the Mayflower lease. This would compel a transfer to him by the defendant of one-half of the 24,800 shares of the capital stock of the Silver King Mining Company, received by Emery for his interest in the property conveyed to that company, and would entitle him to one-half of the profits and dividends received by Emery in his lifetime and by the defendant since his decease. It appears that all the property rights in controversy in this case have grown out of, and constitute the sequence of, the purchase by Emery of the one-fifth interest in the Mayflower lease. It is admitted that the whole purchase price was $8,000, and the plaintiff contends that he advanced to Emery one-half of that sum, under an agreement that the interest should be bought on their joint account, although by and in the name of Emery; he acting as agent for the plaintiff as to the one-half of the property purchased. If such an agreement was made, and the property actually purchased thereunder, it will

bind the defendant as administratrix. It would not be void under the statute of frauds, because not in writing, and could be enforced in a court of equity. That statute does not effect the creation of a resulting trust. In such a trust, intention is an essential element, and that is never expressed in words of direct creation, but is inferred or presumed, by law, from the facts and circumstances of the case, and, there being no evidence to create a trust, it follows that no declaration of an intention, properly executed, would have been made. Hence it is that, where one person purchases real property, and takes in his own name a conveyance of the legal title, when the purchase money or consideration is paid by another, in equity a trust immediately arises, in favor of him who paid the purchase price, constituting him the *cestui que trust*, and the holder of the legal title the trustee. Thereafter such trustee will not be heard to deny the claim of his *cestui que trust* on the ground that there was no agreement in writing, and in such case there is no longer any question that the facts and circumstances, showing the trust relation and the existence of the trust, may be proved by parol evidence, even after the death of the trustee. So, payment of a certain portion of the purchase price will create a resulting trust to the extent of that portion, and the same principles apply as to a payment of the whole. Such is the settled law as to resulting trusts, both in England and in this country. *Boyd* v. *McLean*, 1 Johns. Ch. 582.

Where, however, a bill in equity seeks to convert a defendant, who purchased property and had the legal title thereto made in his own name by an instrument in writing, into a trustee for the plaintiff, upon the ground that the purchaser was acting as agent, and that plaintiff furnished the money, the burden is on the plaintiff to establish, by evidence dehors such instrument, such facts

as will show that the purchaser was acting for the plaintiff, and such facts must be inconsistent with the idea that the purchaser acted solely for himself. Likewise, where one who claims to have furnished a moiety of the purchase price seeks to convert the purchaser into a trustee *pro tanto*, and where, as in this case, the testimony relied upon to establish such a trust is oral, a preponderance thereof is not sufficient. In such event the proof must be strong, clear, and convincing, such as to leave no doubt of the existence of the trust. Such a case is similar to one where it is attempted to convert a deed absolute into a mortgage, or where the reformation of a written instrument is sought on the ground of accident, mistake, or fraud. In all such cases the court will scrutinize parol evidence with great caution, and the plaintiff must fail unless it is clear, definite, unequivocal, and conclusive. Public policy, and the safety and security of titles to real estate, demand this rule, because such evidence is offered to overcome the strong presumption, arising from the terms and conditions of an instrument in writing, which is always the best evidence of title. If it were once established that the effect of the terms of a written instrument could be avoided by a bare preponderance of parol evidence, the gates to perjury would soon be wide open, and no person could longer rest in the security of his title to property, however solemn might be the instrument on which it was founded. "The effort always is, in cases of this class, to overcome and destroy a regular, formal, written title, by showing, by evidence less solemn and trustworthy than the written instrument itself, that, though the deed says that the purchase money was paid by A, and the lands were conveyed to him for his own use and benefit, yet, in truth, he did not pay the purchase price, but it was paid by B, and the conveyance was not made to A for his own use and benefit, but to

him in trust for B. To make such an effort successful, the law, for the safety of titles, requires that the proof shall be of the most convincing and satisfactory kind. Nothing short of certain, definite, reliable, and convincing proof will justify the court in divesting one man of title to lands, evidenced by a regular deed, and putting it in another." *Midmer* v. *Midmer's Ex'rs*, 26 N. J. Eq. 299.

In *Johnson* v. *Quarles*, 46 Mo. 423, Mr. Justice Bliss, delivering the opinion of the court, said: "Were this one of those questions, so far as the main fact is concerned, upon which the court would be bound to carefully weigh and decide upon the preponderance of the evidence, we might, perhaps, be warranted in saying that the money used by Poindexter in the purchase of the lots probably belonged to Mrs. Quarles, or to her and Halladay. But it is not thus that the strong presumption arising from a deed can be rebutted. There is no doubt that a trust will ordinarily result, in favor of one whose money is used by another in the purchase of land, when the conveyance is taken to himself instead of to the person who furnished the money; nor is there any doubt that the facts that create the trust may be proved by parol. For a long time the courts refused, and they have always hesitated, to permit the language of a deed to be thus contradicted, and a title created contrary to the statute of frauds. But, while admitting such evidence for the purpose of creating a resulting trust, the chancellor has always required that it be clear and unequivocal. The insecurity of titles, and the temptation to perjury, among the chief reasons demanding that contracts affecting lands should be made in writing, also imperatively require that trusts arising by operation of law should not be declared upon any doubtful evidence, or even upon a mere preponderance of evidence." So, in *Howland* v. *Blake*, 97 U. S. 624, the supreme court of the United States, speaking

through Mr. Justice Hunt, said: "In each case the burden rests upon the moving party of overcoming the strong presumption arising from the terms of a written instrument. If the proofs are doubtful and unsatisfactory, if there is a failure to overcome this presumption by testimony entirely plain and convincing beyond reasonable controversy, the writings will be held to express correctly the intention of the parties." 1 Story, Eq. Jur. § 157; 2 Pom. Eq. Jur. § 1040; *Dalton* v. *Dalton*, 14 Nev. 419; *Maxwell Land-Grant Case*, 121 U. S. 365, 381, 7 Sup. Ct. 1271; *Crissman* v. *Crissman*, 23 Mich. 217; *Groves* v. *Groves*, 3 Younge & J. 163; *Nicolls* v. *McDonald*, 101 Pa. St. 514; *Stock Bridge Iron Co.* v. *Hudson Iron Co.*, 107 Mass. 290; *Lench* v. *Lench*, 10 Ves. 511; *Bingham* v. *Thompson*, 4 Nev. 224; *Nevins* v. *Dunlap*, 33 N. Y. 676.

In this case, to overcome the presumption arising, in favor of Emery, from the purchase of the one-fifth interest in the Mayflower lease, the plaintiff introduced evidence tending to show admissions, made by Emery in his lifetime, to the effect that the plaintiff was equally interested with him in the property purchased on account of furnishing the purchase money. While, as has been seen, a resulting trust may be established by parol evidence, in favor of one who furnished the money for the purchase of property the title to which was taken in the name of another, still such evidence must be confined to the proof of facts from which the law will infer the trust; and, when it is sought to establish such trust by the aid of admissions and declarations of the nominal purchaser, the court will receive and consider the evidence of the same with great caution, because such evidence is generally of a most unsatisfactory and dangerous kind, and especially is this so when the alleged trustee is dead, and no explanation of the meaning intended to be conveyed by him can be made. Evidence of this class depends

wholly upon the uncertain recollection of witnesses, who, through lapse of time, or mistake, or imperfect understanding, or improper or corrupt motives, may represent the deceased as having expressed an idea precisely the reverse of what was intended by him. Often, too, the slightest variation, by the witness, from the language employed by the deceased, or a different intonation or inflection, may impart an entirely different thought from that in the mind of the speaker at the time of the declaration. Reflection upon the inaccuracy of ordinary witnesses in the use of language, upon their want of original comprehension of a conversation, their liability to connect subsequent facts and circumstances with the original transaction, the impossibility of their recollecting, translating, and reproducing the exact terms employed in a conversation, especially after a considerable lapse of time, must impress upon every lawyer and jurist who has had experience in the trial of causes the danger of placing substantial reliance upon this class of testimony. It is so capable of inaccuracy, so susceptible of fabrication, so impossible of contradiction, where the person alleged to have made the admissions is dead, that it, of itself, cannot be held sufficient to overcome the strong presumption, arising from the terms of a written instrument showing title in the grantee, and establish a trust. In such case the plaintiff cannot succeed unless, in addition to such evidence, his proof shows such pertinent facts and circumstances, *aliunde* the instrument of conveyance, as, with the evidence of admissions, renders it clear, beyond any reasonable controversy, that the claimant in fact furnished the money to the grantee, for the purpose of making the purchase under trust relations, and not as a loan or otherwise. So, where witnesses, after a lapse of years testify to conversations, had with a person since deceased, in which it is claimed admissions

or declarations were made by the deceased respecting matters in which such witnesses had no special interest, their testimony is obviously weak, and will be closely scrutinized, and, unless it is supported by other facts proven, or unless the conduct of the parties to the controversy, respecting the subject-matter or transaction concerning which the alleged admissions are claimed to have been made, is shown to have been consistent with such admissions, or it is shown conclusively that they were deliberately, in good faith, made, it ought not to receive controlling weight in establishing a resulting trust.

In 1 Greenl. Ev. § 200, the author says: "With respect to all verbal admissions, it may be observed that they ought to be received with great caution. The evidence, consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistake; the party himself either being misinformed, or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say." In *Clement* v. *Clement*, 1 Jones, Eq. 184, where the effort was to establish a resulting trust, after the death of the alleged trustee, in whose name the title to the property stood, chiefly by alleged declarations and admissions of the deceased, Mr. Justice Battle, delivering the opinion of the court, likened the case to one brought to convert a deed absolute into a mortgage, and said: "The court would be faithless to the high trust confided to it, did it not, in such cases, proceed with great caution, and require something more than proof of the party's declarations to take from him his estate, in whole or in part. Such testimony is, as that eminent judge, Sir William Grant, has said, 'in all cases most unsatisfactory, on

account of the facility with which it may be fabricated, and the impossibility of contradicting it. Besides, the slightest mistake or failure of recollection may totally alter the effect of the declaration.' Hence the rule that, in addition to the proof of declarations, there must be proof of facts and circumstances, *dehors* the deed, inconsistent with the idea of an absolute purchase by the party for himself." In *Hyden* v. *Hyden*, 6 Baxt. 406, Mr. Justice Freeman, delivering the opinion of the court, referring to the rule that, to establish such a trust, in this class of cases, in opposition to the terms of a written instrument, the payment, under the trust relation, of the money of the person who claims to be a *cestui que trust* must be clearly proven, said: "This rule is based on the soundest legal principles, for the parol proof must, of necessity, be the testimony of witnesses as to what parties have said or verbally agreed to,—a class of testimony notoriously weak,—and the fact to be overturned is a writing, the best evidence as to where the legal title is." *Ringo* v. *Richardson*, 53 Mo. 385; *Hinton* v. *Pritchard*, (N. C.) 12 S. E. 242; *Corder* v. *Corder*, 124 Ill. 229, 16 N. E. 107; *Lehman* v. *Lewis*, 62 Ala. 129; *McKinnon* v. *McKinnon*, 46 Fed. 713; *Kennedy* v. *Kennedy's Estate*, 57 Mo. 73; 1 White & T. Lead. Cas. Eq. 335: *Purcell* v. *Miner*, 4 Wall. 513; *Dreher* v. *Town of Fitchburg*, 22 Wis. 643; *Russell* v. *Miller*, 26 Mich. 1.

Having considered the legal principles applicable to this class of cases, and ascertained the amount and kind of evidence required to establish a resulting trust, in favor of one who claims to have furnished and paid the purchase price of property, the title to which stands in the name of another, and having considered the weight which ought to be given to parol proof of admissions and declarations alleged to have been made by a person since deceased, respecting such property, it becomes necessary

to look into the evidence to ascertain whether the facts
and circumstances proven in this case are such as will
entitle the plaintiff to the relief which he seeks. It is
admitted Emery purchased a one-fifth interest in the
Mayflower lease on July 30, 1889, for $8,000, and that he
received $4,000 from the plaintiff. The material and
decisive question is whether this $4,000 was furnished
by the plaintiff to Emery as a loan, or as a part of the pur-
chase price of that interest under an agreement as set up
in the complaint. It appears, from the testimony of the
plaintiff, that on the stub of the check drawn for the
$4,000 was this notation, "August 1st, 1889, A. B. Emery,
account R. C. C., loans $4,000"; and on plaintiff's daybook
is found an entry, "1889, August 1st. Sundries, to Wells,
Fargo & Co. R. C. Chambers, loan account, check 9,753,
A. B. Emery, $4,000"; and on his journal appears,
"August 1st, A. B. Emery, check 9,753, loan $4,000." His
ledger journal, according to Witness Rood's testimony,
shows a payment by Emery to plaintiff, on January 23,
1890, of $1,000 on note; and the same testimony shows a
further payment, on March 15, 1890, of $3,000,—aggre-
gating $4,000, which balanced the amount received from
the plaintiff. The payment of $8,000, made on April 21,
1892, was credited, on the plaintiff's daybook, to A. B.
Emery, as a loan from him. From the testimony of the
witness Wilson, it appears that the plaintiff disclaimed
to the witness any interest in the property in question.
The evidence here referred to, if unexplained, would
show, almost beyond reasonable controversy, that, up to
1892, the plaintiff himself had characterized the $4,000
in question as a loan.

In explanation, however, it is urged that he was
engaged in large business ventures, and was anxious that
the fact of his having any interest in the Mayflower lease
should be kept secret, because the Mayflower property

was then involved in litigation, and that he thought he could more readily obtain information concerning that litigation if his personal interest in the Mayflower property remained a secret. It is also claimed that some of the entries were made by mistake. Full consideration of all the explanations offered, however, impels the assertion that they are not satisfactory; and especially is this so when they are considered in connection with the plaintiff's own testimony in the suit involving the ore bodies of the Mayflower mine, where Ezra Thompson and others were plaintiff's and Emery and others were defendants. He then declared, under oath, that he had no interest in the Mayflower lease, beyond this, that he had assisted Emery in purchasing his interest. This evidence is entirely consistent with the entries in the books tending to show a loan made to Emery of the sum in question, and in no way aids the explanations referred to. It is apparent that the excuse advanced to avoid the effect of the evidence here considered is too impotent to become the basis of relief, and the plaintiff cannot prevail, unless there is other evidence to show that the $4,000 advanced by him was not a loan. This leads to an examination of the testimony respecting the alleged admissions of Emery in his lifetime. On this point the plaintiff introduced a number of witnesses, who testified with considerable clearness and precision. The witness Keith testified that Emery admitted to him, in several conversations, that the plaintiff was interested in the property in question, and that, on one occasion, when it appeared uncertain whether or not he could get the one-fifth interest in the Mayflower lease, Emery became excited, and said: "How can I go back now and face Chambers? I got the money from him, and he went in half interest with me." Thomas Kearns, another witness, testified

to several conversations, the first of which occurred in 1890, in which the witness said Emery admitted that the plaintiff was interested in the Mayflower lease. The witnesses Macintosh and Moffatt testified to similar conversations and admissions. These witnesses, for the most part, attempted to reproduce the exact language used by Emery, although the conversations occurred some years prior to the time when they were called to testify, and some of them were casual conversations, in which the witnesses had no special interest. While they are doubtless reputable men, and were actuated by honest motives while testifying, still it may be perceived how dangerous it is to give full credit to parol testimony of conversations, after a long lapse of time, however honest may be the intention of the witnesses, when we consider the fact that the witness Rood testified, positively, that he delivered the check for $4,000 to Emery, under certain instructions of the plaintiff, and in this was corroborated, in the same positive manner, by the plaintiff himself, and yet it was afterwards shown that no such instructions were given, and that the witness Rood never did deliver the check to Emery, but that the plaintiff himself forwarded it, in a letter written by him to Emery. While these witnesses, doubtless, did not intend to testify to that which they knew to be untrue, still the circumstance serves to illustrate the fallibility of the human mind, and to show that, ordinarily, such testimony is unreliable, and, unless corroborated by other facts and circumstances, clearly proved or admitted, inconsistent with the hypothesis that the person holding the legal title is the sole owner of the property, should not be made the basis to establish a resulting trust; and especially is this so where the witness was a mere stranger, having no interest in the transaction to which the conversation related.

In further support of the alleged trust, the plaintiff introduced a letter from Emery, as follows:

"PARK CITY, Utah, April 20, 1892.

"R. C. CHAMBERS, ESQ.,

"Salt Lake City:

"*Dear Sir*—Inclosing draft 42,897, Richardson, cashier, on Wells, Fargo & Co., for $8,000, payable to your order. We completed the purchase of the Silver King yesterday, and paid them their money, and also declared a dividend for $10,000 to each fifth interest. You probably have more use for the money than I have, so I· send you the major portion.

"A. B. EMERY.

"I may say that, if we are not obstructed, such dividends should hereafter be made monthly."

It is contended that this letter discloses a payment by Emery to the plaintiff on account of dividends received from the property in question. If this contention be correct, then Emery ought to have sent the plaintiff the whole of the dividend, and, in addition thereto, more than $3,000, because in such event, he would have had profits and dividends in his hands, belonging to the plaintiff, to the amount of over $13,000. There is no intimation in the letter of any balance, and, when it is considered that the $8,000 was entered in plaintiff's own books as a loan to him from Emery, it is difficult to perceive how this letter can add much weight in plaintiff's behalf. Not only is it difficult, by careful perusal, to find, from the evidence in this case, any material facts or circumstances which corroborate or support the alleged admissions, but there appears to be much, in the conduct of both Emery and the plaintiff respecting the property in controversy, which is consistent with the theory that the $4,000 was advanced to Emery as a loan, and wholly inconsistent

13 UTAH—26

with the contention that it was sent to him as agent, and that the purchase of the Mayflower lease was made under the alleged agreement set up in the complaint for the joint benefit of Emery and the plaintiff. From the time of the purchase of the interest in the lease, to the date of his death, Emery appears to have exercised, not only exclusive ownership and control over the property in question, but also over the profits and dividends arising therefrom. His acts of ownership seem to have been precisely what would be expected of an actual and sole owner of property. He purchased the property in his own name, and afterwards had the certificates of stock, representing the number of shares of the capital stock of the Silver King Mining Company, to which his one-fifth interest in the property entitled him, made out to him alone, and up to the time of his death, on June 13, 1894, received over $110,000 in dividends; the last dividend having been received by him but a short time prior to his death, and appropriated to his own use without making any accounting whatever to the plaintiff, or, so far as shown by the evidence, recognizing any interest therein but his own. There is evidence tending to show that he promptly applied the profits arising from the property in the payment of the $4,000 which he had obtained from the plaintiff, making final payment thereon in March, 1890, and thereafter, as before, exercised dominion over the property, and received the dividends, and converted them as he saw fit. Nor does it appear that, at any time, he sought the advice or consent of the plaintiff in these business ventures. Clearly, such conduct indicates no intention on the part of Emery that the plaintiff should be equally interested with him in the property, nor does it indicate any admission that he was so interested, or that the purchase of the Mayflower

lease was made with such intention, pursuant to the alleged agreement.

So the conduct of the plaintiff was consistent with the idea that the $4,000 was a loan. It does not appear that he ever exercised any dominion or ownership over the property, or over the dividends or profits, or that he ever demanded of Emery any share of the one-fifth interest in the Mayflower lease, or any division of the 24,800 shares of capital stock of the Silver King Mining Company, or any accounting of the profits or dividends. He characterized the $4,000 advanced by him, in his books, as a loan, and the $1,000 received by him as a payment on a note, and showed a payment of the balance by Emery on March 18, 1890. On September 20, 1891, the plaintiff wrote Emery for money, promising to repay on demand, and in September and October of the same year borrowed from him and his associates $42,000, afterwards giving his note, payable on demand, without making any allusion that Emery had not accounted to him for any share of the dividends; and yet, if plaintiff's claim is well founded, there was then in Emery's hands, as shown by the evidence, $8,792.48. So the plaintiff, in the presence of Emery, on July 5, 1893, executed his notes to Emery's associates for amounts aggregating $33,600, notwithstanding the fact that, if the plaintiff was equally interested with Emery in the property, there was due him from Emery, at that time, $22,307, exclusive of the $8,000 sent him April 20, 1892, and of $8,400, the one-fifth of the $42,000; and yet the plaintiff made no intimation, so far as appears from the record, that there was anything whatever due him from Emery, although it is apparent, from the evidence, that all the while the plaintiff was in need of money. To say the least, such conduct is extraordinary, and it would seem very difficult to reconcile it with the plaintiff's present claim that he is entitled to an

interest in the property. It is true the witness Keith testified that, at the time these last-mentioned notes were given, Emery said he would not ask the plaintiff for a note, but would let it go in the settlement. Conceding that this statement was made, it can add little strength to the plaintiff's case, because it would simply indicate that he considered himself entitled to receive a note, if he desired to demand one.

Further review and discussion of the evidence would be useless, notwithstanding that other points thereon are presented by counsel. From a careful examination of the whole record it is impossible to conclude that the plaintiff has established a resulting trust by clear, satisfactory, and convincing evidence, whatever may have been his secret understanding and relation with Emery respecting the entire transaction. It may be possible that he had an interest in the property, and that the record does not reveal the real intentions of Emery and himself; but if such be, in reality, a fact, then the inability to show such fact on the trial of the cause must be attributed to the infirmity of the law, in a case where the mouth of one of the principal actors is closed by death, and of the other by statute; and, in such event, the unavoidable misfortune must be attributed to the plaintiff's own negligence. It is better that he who has been thus negligent in his business transactions should suffer loss than that the court should establish a precedent which would at once put in jeopardy the estates of all deceased persons, by rendering futile written instruments of conveyance, and permitting the title to real property to rest on the uncertain recollections of witnesses and hearsay evidence. Counsel have adverted to the effect that a decision in this case in favor of one party would have upon the integrity of the other. This is a question which cannot concern us. It is our duty to declare the law as we

perceive it, and a failure to do so would render this court unworthy of the high trust reposed in it. Under the peculiar circumstances of this case, however, we disclaim any intention to cast reflections either upon the plaintiff, or upon the deceased, or upon the good faith of the plaintiff in instituting this suit. To conclude, from the evidence in this case, that the plaintiff was entitled to the relief demanded would be to disregard every well-considered decision, in similar cases, which has come under our notice.

Counsel for the appellant further insist that the court made no express findings on the issues raised by the defense of laches and the statute of limitations, set up in the answer. In answer to this contention, it may be said that, after the court found that the alleged claim of the plaintiff never had any existence, in fact, it was not necessary to find that the plaintiff was guilty of laches; nor was it then necessary to find that a claim which had no valid existence was barred by the statute of limitations. If the plaintiff was never entitled to any portion of the property in dispute, he could not recover, regardless of the length of time which had elapsed since the purchase by Emery, and hence the defense of the statute of limitations had become immaterial, and a failure to find expressly on all the facts involved in that defense was not error. *Groome* v. *Ogden City Corp.*, 10 Utah 54, 37 Pac. 90; *Porter* v. *Woodward*, 57 Cal. 535.

It is also insisted that the court erred in striking out the testimony of the witness Weber. The witness detailed a conversation which he had with Emery about stock of the Silver King Mining Company, but no reference was made to the plaintiff. We think the statements were too indefinite to aid the plaintiff's case, and therefore no prejudice could result from striking it out. Nor do we think the court erred in excluding from evidence three bonds,

executed in the case of *Ezra Thompson et al.* v. *David Keith et al.*, on which bonds the plaintiff was a surety; or in refusing to permit the plaintiff to show that he secured two of the other bondsmen. It is not clear how the plaintiff could have been injured by the exclusion of such testimony. The fact that he was a surety on the bonds in that case, and secured others, would have no tendency to prove that he is entitled to the relief which he seeks as against the estate of Emery. Nor do we think the court erred in sustaining defendant's objection to the question asked the plaintiff, as follows: "I will ask you if you have received any money as the result of Emery's interest in the Mayflower lease and the extensions thereof." Counsel for the plaintiff admitted, when the question was propounded, that whatever money the plaintiff had received on account of that interest he had received from Emery. The reference, therefore, was to a transaction equally within the knowledge of the witness and the deceased, and thus came within the inhibition of the statute found in Sess. Laws Utah, 1894, c. 31, pp. 26, 27. So, likewise, the court properly refused to permit the plaintiff to testify whether or not he had ever had in his possession a note made by A. B. Emery, or whether, on the 22d of March, 1890, he had such a note in his possession, because equally within the knowledge of the witness and the deceased, and therefore within the provisions of the statute.

We have thus, at considerable length, referred to and reviewed all the material points raised in the record, and in deciding this case we have neither been unmindful of its great importance, as affecting the security of titles to real property in this State, nor of the consideration which the rights of the parties in justice demand. We have carefully examined the record and the able briefs of counsel on both sides, and, upon such examination, our

conclusion is that the learned judge before whom the case was tried rendered a fair and impartial decision, which cannot be disturbed without doing violence to the well-established legal principles which govern cases of this kind. There is no reversible error shown by the record. The judgment is affirmed.

HIGGINS and STREET, District Judges, concur.