SAMUEL C. EWING et al., Appellants, *v.* DAVID KEITH et al., Respondents.

Reformation of a Deed—Evidence—Trust—Declaration of a Party in His Own Favor not Admissible.

1 In an action to declare a deed to be a mortgage, it is incumbent upon the party seeking such relief to overcome, by clear, unequivocal, convincing testimony, the strong presumption arising in favor of the terms of the written instrument.

2. *Trust.*

The law does not imply, and the court will not presume, a trust, except in a case of necessity.

Declarations of a witness made out of court may be received in evidence to impeach, but are not admissible to corroborate, his sworn testimony, but this rule is subject to certain exceptions. The unsworn admissions and statements of a party made out of court, in the absence of the other party in interest, are not admissible for the purpose of corroborating his sworn testimony, except in extreme cases, where the rejection of the statements would work a real and manifest wrong; and in no case should such statements be admitted when it appears that

the party making them has any interest or motive in making them, when he was subject to disturbing influences, or when the ultimate effect and operation arising from a change of circumstances could have been foreseen.

(No. 869. Decided Feb. 10, 1898.)

Appeal from the Third district court, Salt Lake county. Ogden Hiles, *Judge.*

Action by Samuel C. Ewing and another against David Keith and another. From a judgment for defendants, plaintiffs appeal. *Affirmed.*

It appears from the record that in 1893 the plaintiff Ewing, being insolvent, made an assignment to George Cullins of all his property, for the benefit of his creditors, preferred and unpreferred. At the time of the assignment, Ewing was the owner of an undivided thirteen-fifteenths of the Eldorado mining claim. Keith was one of his preferred creditors, the claim of Keith being evidenced by a note for $1,000, bearing date December 15, 1891, payable 30 days after date, with interest at 1 per cent. per month. On May 7, 1894, no part of the principal on this note being paid, and there being due thereon at that time, principal and interest, $1,190, in round numbers, Keith indorsed upon said note that the same was fully paid, and surrendered the same to Cullins and Ewing; and Cullins, as assignee, and Ewing and wife, joined in a deed as grantors, whereby they conveyed to Keith all their right, title, and interest in the Eldorado claim, the consideration named being $1,000. On the 14th day of December, 1895, Keith and wife conveyed the Eldorado claim to the Silver King Mining Company, the other defendant, Keith having in the meantime obtained title to the remaining two-fifteenths of the Eldorado claim. The consideration named in this deed was $1,690. Keith at this time was

president and director of the Silver King Mining Company. On October 18, 1896, this action was commenced to have the deed of Ewing and wife and Cullins adjudged to be a mortgage to secure the debt as aforesaid, evidenced by said note. On the trial of the action, Keith testified that the deed of May 7, 1894, was just what it purported to be on its face, to wit, a deed absolute. Mr. Cullins, the assignee, also testified that he had always understood that the deed was to be a deed absolute; that he had never heard anything to the contrary; that, before making the deed, he had made particular inquiry as to the value of the property; that he learned from such inquiries that it had no value except as so much surface ground, and so reported to Ewing; that Keith was willing to take the deed in satisfaction of his debt; and that he, as assignee, was satisfied that such would be the most advantageous disposition that could be made of the Eldorado claim; and that he, as assignee, reported so to the creditors of Ewing, when he was seeking to obtain from them their consent to the transfer of this property to Keith in payment of his claim. Mr. Ewing, as appears from his testimony, when he was seeking to obtain the consent of his creditors to the transfer of this property to Keith, represented to them that, in his opinion, the Eldorado claim, if forced to a sale, would not realize sufficient to discharge the Keith debt, and that, therefore, it would be to the advantage of these creditors if Ewing and the assignee were permitted to convey the claim to Keith in payment of his (Keith's) claim. Upon these representations of the assignee and Ewing, the creditors of Ewing did not consent to the transfer, such consent being evidenced by an instrument in writing signed by the creditors. This written consent recited the fact that the Eldorado claim was to be deeded to Keith in payment of what Ewing owed him. For two

years after the execution of this deed, and after the surrender of the note, the fact that there was any debt owing from Ewing to Keith was never alluded to by either Keith or Ewing, and no payment made thereof, nor was any such claim made by Ewing until shortly before the commencement of this action, when it seems he was erroneously informed that a valuable body of ore had been encountered by the Silver King Company in the Eldorado claim. The plaintiff also testified that the mining claim was worth about $10,000; that no ore had ever been taken from it; that he had owned the claim about 12 years, and never expended any money on it, and received no money from it. Other witnesses place its value from $5,000 to $10,000 for the whole claim, but many of the witnesses stated that this value was for speculative purposes. Mr. Keith testified that the value of the mine was $900, and that no ore had been taken from or discovered upon it; that its value consisted mainly of the value of surface ground. Mr. Cullins testified that he obtained from Mr. Keith all it was worth, and that the plaintiff so understood it at the time of the sale. Mrs. Gray, a bookkeeper for Mr. Ewing, testified to a conversation with Mr. Keith, shortly after the assignment, in which Mr. Keith seemed much annoyed that Mr. Ewing had made an assignment without securing him, stating that his was not a business, but a personal, debt, and that Mr. Ewing should have turned over to him his mining claim at Park City, to secure his claim before he made the assignment. This conversation was reported to Mr. Ewing, who afterwards conversed with Mr. Keith upon the subject.

*Baskin & Hoge* and *Bennett, Harkness, Howat & Bradley,* for appellants.

*Dickson, Ellis & Ellis,* for respondents.

MINER, J. (after stating the facts):

The question to be determined by this appeal is whether the deed to Mr. Keith was given and intended as security for the debt evidenced by the note, or as an absolute conveyance of the property in payment of the note. To establish the claim of the plaintiff, the appellant relies upon his own testimony as it stands in the record, supplemented by the somewhat negative testimony of Mrs. Gray, which does not directly bear upon the agreement he relies upon. The entire burden was thrown upon the appellant to overcome, by clear, unequivocal, convincing testimony, the strong presumption arising in favor of the terms of the written instrument; and we cannot say from such testimony alone that we are convinced beyond a reasonable controversy that he has established such claim, or that more proof should not be required to support his contention; and when we take into consideration the testimony of Mr. Keith, and that of the assignee, Mr. Cullins, we are irresistibly led to the conclusion that the evidence falls far short of establishing the satisfactory conviction that the deed was only intended as security for the debt evidenced by the note. The law never implies a trust, and the court never presumes a trust except in cases of necessity. *Dalton* v. *Dalton*, 14 Nev. 419. As a general rule, when it is proposed to set aside, annul, or correct a written instrument for fraud or mistake in its execution, the burden rests upon the moving party to overcome the strong presumption arising from the terms of the written instrument, by clear, unequivocal, convincing testimony; and if there is a failure to overcome this presumption by testimony clear, plain, and convincing, beyond any reasonable controversy, the written instrument will be held to express the intention of the parties.

The deed in question speaks as an absolute conveyance.

When it was delivered, the note was surrendered to the assignee, and marked "Paid" over the signature of Mr. Keith, indorsed thereon. The representation made by the plaintiff to his creditors, when he was seeking to obtain their consent to transfer the property to Mr. Keith, that, in his opinion, the property at forced sale would not bring enough to discharge Keith's debt, and that, therefore, it would be more advantageous to the creditors to allow the assignee to convey the property to Keith in payment of his claim; the recitals in the writing signed by the creditors, which the plaintiff assisted in procuring, consenting to the transfer in payment of Keith's debt; the fact that no interest was paid or tendered to Keith for over two years, and during that period nothing was said to him on the subject of this claim, or the payment of it, until mentioned by the plaintiff, who was erroneously informed, although at the time he believed the information true, that large bodies of ore had been taken from the mine,—all tend to establish the fact that plaintiff's assumed claim was baseless, notwithstanding he may have entertained the belief that it was genuine. Whatever the fact was, the proof is not sufficient to establish the plaintiff's claim. In the case of *Chambers* v. *Emery*, 13 Utah, 374, in discussing the question with reference to reformed written instruments, this court held: "In all such cases the court will scrutinize parol evidence with great caution, and the plaintiff must fail, unless it is clear, definite, unequivocal, and conclusive. Public policy and the safety and security of titles to real estate demand this rule, because such evidence is offered to overcome the strong presumption arising from the terms and conditions of an instrument in writing, which is always the best evidence of title. If it were once established that the effect of the terms of a written instrument could be avoided by a

bare preponderance of parol evidence, the gates to per-
jury would soon be wide open, and no person could longer
rest in security of his title to property, however solemn
might be the instrument on which it is founded."
*Howland* v. *Blake*, 97 U. S. 624; *Hopper* v. *Jones*, 29 Cal.
18; *Henley* v. *Hotalling*, 41 Cal. 22; 1 Jones Mortg. § 253;
*Kennedy* v. *Kennedy*, 57 Mo. 73; *Coles* v. *Bowne*, 10 Paige
535; *Maxwell Land Grant Case*, 121 U. S. 381; *Johnson* v.
*Quarles*, 46 Mo. 423; *Dalton* v. *Dalton*, 14 Nev. 419; *Cook*
v. *Fountain*, 3 Swanst. 591; Story Eq. Jur. § 157; *Crissman*
v. *Crissman*, 23 Mich. 217.

The plaintiffs at the trial offered to prove by Mr. Ewing
that, after his conversation with Mr. Keith concerning
the conveyance of the mine to him, witness went to his
attorneys, Messrs. Brown & Henderson, for information
as to how the legal title to the mining premises in con-
troversy held by the assignee could be conveyed to Keith
to secure his claim, and on this occasion said to his at-
torneys that, if he could succeed in making such arrange-
ment, he thought it would enable him to pay all of his
debts and release all of his property from the assignment;
that the attorneys advised him that, in order to accom-
plish this, he must get the consent of his creditors, and
have the assignee convey the claim to Keith, and that there
should be a written agreement between him and Keith
that the mine was to be held as security for such indebted-
ness; that, with this agreement, the desired end could
be accomplished; and that Mr. Ewing replied that he had
so much faith in Mr. Keith that he would take his word
without a written agreement. The court, under objection,
declined to receive in evidence the statements of Ewing
to his attorneys, or their statements to him, in the ab-
sence of Mr. Keith, to all of which the plaintiff excepted,
and alleges that the court erred in rejecting the offered

testimony.  Upon this question the general rule seems to
be that, while declarations of a witness made out of
court may be received to impeach or contradict him, they
are not admissible as evidence in his favor or to support
him.  The exceptions to the rule excluding such statements
for the purpose of corroborating the witness are few, and
rest upon exceptional circumstances.  One exception to
the rule is where the witness is sought to be impeached by
statements claimed to have been made by him out of
court, which are not in harmony with his sworn testi-
mony; and it is claimed that the different versions of the
transaction given by the witness upon the trial are due
to the fact that he has an interest at the time of the trial
in the result of the litigation, which did not actuate him at
the time he made the impeaching declaration; and also,
where it is claimed that the testimony of the witness is a
recent fabrication, born of his interest in the case, or his
relations to the parties, the party calling the witness is
permitted to defend him against the imputation by show-
ing that soon after the transaction, when he had no in-
terest in the result of the controversy, or an interest
which would have prompted him to give a different
version of the transaction to that testified to by him, he
made statements and declarations respecting the trans-
action consistent with his evidence upon the stand.  A
similar question was decided by this court in the case of
*Silva* v. *Picard,* 10 Utah, 89.  After reviewing the author-
ities bearing upon this question, the court said:  "The
admission of this class of testimony is considered danger-
ous, and the exception to the rule should not be extended,
except it be in extreme cases, and where the rejection
of it would produce real and manifest wrong; and in no
case should such evidence be admitted where it appears
that the party making such declarations has any interest

or motive in making them, or where it does not satisfactorily appear that the account given by the witness, which is subject to be shown in corroboration, was made at a time before its ultimate effect and operation arising from a change of circumstances could have possibly been foreseen, or where the witness is not shown to be free from any influence, pressure, or interest in making the declarations.   *   *   *   For this court to extend the rule making admissible unsworn declarations of a party to the cause, under the circumstances that these statements are shown to have been made, would be to open the doors to fraud, and make easy the way by which a designing schemer and dishonest party could readily overreach his antagonist, and use the courts of justice as an instrument to advance his dishonest purposes." In *Robb* v. *Hackley,* 23 Wend. 50, Mr. Justice Bronson, speaking for the court, says: "If an attempt is made to discredit a witness on the ground that his testimony is given under the influence of some motive, prompting him to make a false or colored statement, the party calling him has been allowed to show, in reply, that the witness made similar statements at a time when the imputed motive did not exist, or when motives of interest would have prompted him to make a different statement of the facts. But, as a general and almost universal rule, evidence of what the witness has said out of court cannot be received to fortify his testimony. It violates the first principle in the law of evidence to allow a party to be affected, either in his person or his property, by the declarations of a witness made without oath; and, besides, it can be no confirmation of what the witness has said on oath to show that he has made similar declarations when under no such solemn obligation to speak the truth. It is no answer to say that such evidence will not be likely to gain credit, and conse-

quently will do no harm. Evidence should not be given
to a jury which they are not at liberty to believe." We are
convinced that but few, if any, well-adjudged cases can
be found where a party to the litigation, who was also one
of the interested parties to the suit out of which the trans-
action arose, has been permitted to place in evidence his
unsworn statements respecting the transaction, made in
the absence of the other party in interest, for the purpose
of corroborating his sworn statements made subsequent
to the hearing of the case. It cannot well be said of such
a party that his relation to the case has been changed;
that his own interest is not being served by the making
of the statements; that he was not subject to disturbing
influences; that the ultimate object and effect arising from
the changed circumstances could not have been foreseen;
nor can it well be said that there never was a time, from
the inception of the transaction involved in the litigation,
when there could have been no motive or interest to influ-
ence him to speak untruthfully concerning it.

We may be pardoned for quoting an apt illustration
from the brief of counsel for the respondents, which
clearly presents the failing that may attend the establish-
ment of the rule contended for by the appellants: "Let
us illustrate: Jones owns ten thousand shares of Ontario
mining stock. Its present market value is $3 per share.
Brown makes a verbal contract with Jones on the 1st day
of January, 1897, for the purchase and sale of 100 shares
to be paid for and delivered on the 1st day of June, 1897,
and, to satisfy the statute of frauds, pays $5 of the
agreed purchase price. Brown now reflects that possibly
by the first of June, 1897, the stock may be very much
more valuable. Straightway he goes to his clerk or his
bookkeeper or banker, and says: 'I have just made a con-
tract with Jones for the purchase of his 10,000 shares of

16 UTAH—21

Ontario mining stock at $3 per share, to be paid for and delivered on or before June 1, 1897.' Now, when the first of June arrives, if the stock is only worth $3 per share or less, Brown calls for and claims his 100 shares only; but, if the stock is worth $50 per share, he lays claim to the whole 10,000 shares, which Jones repudiates. Brown commences his suit, claiming the 10,000 shares at $3 per share. The cause comes on for trial. Brown testifies that the contract was for 10,000 shares. Jones swears that it involved 100 shares only. And now Brown brings forward his clerk, bookkeeper, or banker to corroborate his version of the transaction, by testifying that he (Brown), soon after the contract was entered into, and before he could have known that the stock was going to appreciate so largely, had stated to them severally that his contract was for the purchase of the full 10,000 shares; in other words, if the stock appreciates, he makes his false and fraudulent claim, and offers his unsworn declarations to corroborate him, and enable him to successfully swindle Jones. If, on the other hand, the stock has not advanced, Brown claims his 100 shares only, and these statements of his never come to light. Under such rule of evidence, the dishonest man may enjoy all the chances of gain arising from an uncertain and fluctuating market, with little or no chance for loss." We are of the opinion that the rule, as laid down by this court in *Silva* v. *Picard*, *supra*, is the correct rule governing such cases, and that the testimony offered was properly rejected. Thomp. Trials, § 373; *Reed* v. *Spaulding*, 42 N. H. 114; *Seolp* v. *Blair*, 68 Ill. 541; *Commissioners* v. *Jenkins*, 10 Gray 485; 2 Tayl. Ev. § 1473; 1 Whart. Ev. § 570; *People* v. *Doyell*, 48 Cal. 85; *Queen* v. *Hepburn*, 7 Cranch 290; *State* v. *Carrington*, 15 Utah 480. The findings, decree, and judgment of the trial court are affirmed.

ZANE, C. J., and BARTCH, J., concur.