Wilson v. Cunningham et al.

E. W. WILSON, Trustee in Bankruptcy of the Estate of John Beck, a Bankrupt, Appellant, v. J. A. CUNNINGHAM, JOSIAH BARNETT, Trustee, ZION'S SAVINGS BANK & TRUST COMPANY, a Corporation, THE SECURITY LOAN & STORAGE COMPANY, a Corporation, THE BULLION-BECK & CHAMPION MINING COMPANY, a Corporation, P. T. FARNSWORTH and A. E. HYDE, Respondents.

No. 1305.    (67 Pac. 118.)

1. Equity: Suit to Set Aside Bill of Sale: Sufficiency of Evidence to Support Findings.

A bankrupt owned certain stock in a corporation, which he transferred to a trustee as security for certain debts, and which was attached and was to be sold on execution. On the morning of the sale, the bankrupt applied to defendant for money to pay the execution creditor; offering to transfer the stock as security, but retaining the privilege of redemption. Defendant refused, but agreed to advance the money on an absolute transfer of the stock, which was done; the bankrupt signing an absolute bill of sale. Defendant's attorneys, who were present at the sale, corroborated this evidence; and it was shown that the bankrupt's attorney had previously drawn a transfer of the stock, with the right to redeem, but all parties admitted that this was refused. Four directors of the corporation testified that the bankrupt stated

at the time he resigned from the directorate that he had sold the stock to defendant. The amount advanced on the stock was a reasonable consideration therefor. *Held,* sufficient to support a finding that the sale was absolute, and not conditional, and it could not be set aside as in fraud of creditors.

## 2.  Same: Disturbing Findings on Appeal.

When there is a conflict in the testimony in equity suits, or it is evenly balanced, and the findings of the trial court thereon are sustained by the evidence, such findings will not be disturbed on appeal; but, when the testimony preponderates on one side or the other in such a way as to convince the appellate court that the court below has erred, the judgment will be reversed.[1]

## 3.  Same: Burden of Proof.

In a suit to set aside a bill of sale the burden of proof is on the plaintiff to overcome the presumption in favor of the instrument by testimony clear, plain, and convincing, beyond reasonable controversy.[2]

(Decided December 13, 1901.)

Appeal from the Third District Court, Salt Lake County.— *Hon. Ogden Hiles,* Judge.

Action by the plaintiff, as trustee in bankruptcy of John Beck, against the defendants, to obtain a decree declaring the transfers of certain stocks to defendant Cunningham fraudulent and void as to Beck's creditors and for an accounting as to the amount due upon the alleged pledge of said stock to Josiah Barnett as trustee for certain of the defendants. From a decree in favor of the defendants, plaintiff appealed.

AFFIRMED.

*A. T. Schroeder, Esq.,* and *Messrs. Brown & Henderson* for appellant.

[1]McKay v. Farr, 15 Utah 264; 49 Pac. 649; Klopenstine v. Hays, 20 Utah 56; 57 Pac. 712; Whitesides v. Green, 13 Utah 351; 44 Pac. 1032; 57 Am. St. Rep. 740.

[2]Ewing v. Keith, 16 Utah 312; 52 Pac. 4; Chambers v. Emery, 13 Utah 374; 45 Pac. 192.

The rules of law applicable to this case, and by which this transaction must be tested, are elementary: that a transaction made between a debtor and another person, by which the debtor puts in the hands of that other person property, belonging to him under a transfer which is absolute on its face, but with a secret oral understanding between them that the debtor reserves an interest in the property for his own benefit, is fraudulent and void.   This is so elementary and so generally understood that we shall not cite authorities to this proposition, unless there shall be some denial of the principle by the respondents.

Such a transaction as last above stated may be avoided by the creditors, notwithstanding a valuable consideration, if the purchaser was cognizant of the seller's intent.   Rogers v. Evans, 3 Ind. 574; Ruffing v. Tilton, 12 Ind. 260; Wadsworth v. Williams, 100 Mass. 126.

If the pretended purchaser has knowledge of the facts sufficient to excite the suspicion of a prudent man as to the fraudulent intent of a debtor, and put him on inquiry, he makes himself a party to the fraud.   Bartles v. Gibson, 17 Fed. Rep. 293; Atwood v. Impson, 20 N. J. Eq. 150-156; Baker v. Bliss, 39 N. Y. 70; David v. Burchard, 53 Wis. 492; Hunsinger v. Hafer, 110 Ind. 390; Hedrick v. Strauss, 42 Neb. 485; Bussard v. Bullitt, 64 N. W. 658; Schmidt v. Opie, 33 N. J., Eq. 138.

*P. L. Williams, Esq.,* for respondent, Cunningham.

This respondent has no controversy with the appellant as to the general principles enunciated in the authorities cited, but makes the suggestion that this case does not present an instance for their application.   The case here was rightly decided by the court below upon the testimony, and should be affirmed, as this respondent insists, upon that testimony, even though it were to be considered by this court independent of

the finding of that.    But this court will not disturb the findings of the court below even in an equity case where the testimony upon which that finding was made is conflicting.    If counsel for the appellant does not assent to the view entertained and urged by respondent that the preponderance of the testimony is not only not with the appellant, without which he is not entitled to recover, but it is fact with the respondent, still he can not insist that there is not a substantial conflict in the testimony, and if that is true, then by the rule frequently announced by this court, the findings and decree in this case must be affirmed.    Wells v. Wells, 7 Utah, 75, 76; Mining Co. v. Haws, 7 Utah 517; Dooly Block v. Rapid Transit Co., 9 Utah 45; Stohn v. Hall, 10 Utah 403; Whitesides v. Green, 13 Utah 351; McKay v. Farr, 15 Utah 264; Klopenstein v. Hays, 20 Utah 56; Irrigation Co. v. Moroni, etc. Co., 21 Utah 238.

*Messrs. Brown & Henderson* in reply.

The statutes of this State in equity cases gives the right to appeal to this court upon the facts.    It is a substantial right.    We concede that in doubtful cases, where it requires nice balancing of the testimony, that the court will give weight to the determination of the court that heard the testimony and saw the witness.    But this rule does not mean in an equity case, that the court is to give the same presumption that it does to a judgment in a suit at law.    This court is required to weigh the testimony, and to take up the question that was tried below as an original question in this court, and if the testimony fairly and reasonably preponderates in favor of the appellant he is entitled to a judgment from this court accordingly.    If on the other hand the question of fact presented is one that is difficult, and depends upon the nice balancing of opposing testimony, weight will be given to the determination of the court below, and may determine the question by upholding the

judgment appealed from.   Godfrey v. Moser, 66 N. Y. 250;
Worrall's Appeal, 110 Pa. St. 349; Benne v. Schnecko, 13
S. W. 82; Bank v. Stapp, 30 S. W. 1000; Chamberlain v.
Raymond, 3 Utah 119.

### STATEMENT OF FACTS.

This is an action brought by the appellant, as trustee in
bankruptcy of John Beck, against the defendants, to obtain a
decree declaring the transfer of 51,000 shares of the stock of
the Bullion-Beck & Champion Mining Company and 50,000
shares of the capital stock of the Indian Creek Gold Mining
& Milling Company to the defendant J. A. Cunningham
fraudulent and void as to Beck's creditors, and for an account-
ing as to the amount due upon the alleged pledge of said stock
to Josiah Barnett as trustee for certain of the defendants.   It
is alleged that all of said stock was deposited with Josiah Bar-
nett, as trustee, to secure certain claims, according to a con-
tract executed by Beck and said creditors; that thereafter the
equity of John Beck was levied upon under an execution
issued upon two judgments in favor of Sarah Everard, and
was advertised for sale on the eleventh day of May, 1899, at
12 o'clock noon, under said execution.   The plaintiff claims
that on that day Beck agreed with Cunningham that the latter
would advance the money necessary to pay said judgments and
execution and protect the equity of Beck therein, and that the
latter should repay Cunningham the amount so advanced,
together with $15,000 as a bonus, and that when this was
paid the stock would belong to Beck, subject to the trustee's
lien; but, for the purpose of keeping the stock beyond the
reach of certain other creditors of Beck, a bill of sale absolute
in form was made, and the said stock delivered to Cunning-
ham, with Beck's right to redeem.   The defendants contend that
the bill of sale of the stock was not only absolute in form, but
was intended by the parties to carry all the equities of Beck

in said stock, in consideration of $24,500 then advanced by Cunningham to pay off the attachment liens thereon in favor of Mrs. Everard, and denied that the stock was to be held for Beck's benefit, or that Beck reserved any right or benefit therein. The case was tried before the court upon the issue made, as to whether the bill of sale of the stock was absolute, conveying all of Beck's equity therein, or whether it was made with a secret agreement by which Beck reserved an interest in it after all the liens thereon were paid; in fact, whether the sale was absolute or conditional. The trial court found all the equities in favor of the defendants, and decreed a dismissal of the complaint. The plaintiff appeals from the decree.

The question now for determination is whether Mr. Cunningham's purchase of Beck's equity in the stock in question was absolute or not. The bill of sale reads as follows: "For and in consideration of twenty-four thousand five hundred and forty-eight and sixty-eight one-hundredths dollars, lawful money, to me paid by J. A. Cunningham, receipt of which is hereby acknowledged, I do hereby bargain, sell, assign, transfer, set over, and deliver unto said Cunningham, his heirs and assigns, forever, all the shares of capital stock represented by stock certificate No. 338 of the Bullion-Beck & Champion Mining Company, a corporation, to-wit, 51,000 shares, together with the certificate representing the same, which is now in the custody of Josiah Barnett as trustee, and as security for the payment of certain claims and demands thereupon, aggregating about $284,000, and interest. To have and to hold unto said Cunningham, his heirs and assigns, forever. Witness my hand and seal at Salt Lake City, Utah, May 11, A. D. 1898. John Beck. Signed in the presence of William C. Hall."

It appears, in substance, that on or about the sixteenth day of August, 1897, Beck, the owner of the stock, was indebted to several parties, and, in order to secure them, entered into the agreement referred to, wherein Mr. Barnett was made

trustee, and the stock was transferred to him to secure the payment of the claims, aggregating in all about $284,000. At this time Mrs. Everard had levied upon Beck's equity in the stock so in the hands of Mr. Barnett, upon a claim amounting to $24,000; and the sale was to take place on the eleventh day of May, at 12 o'clock noon. Mr. Beck had made many fruitless efforts to procure the money with which to pay off the liens of Mrs. Everard, by giving security upon his equity in the stock. Having failed, he made application to Mr. Cunningham some time before the sale, and was refused. He again made application to Cunningham for the money about an hour before the sale was advertised to take place. He testified, in substance, among other things, that at this time he offered Cunningham $15,000 bonus to pay off the Everard claims against the stock, including about $17,500 in addition to which he owed Mr. Cunningham on two notes. He states that he proposed to Cunningham to take the stock as security, giving him (Beck) a chance to redeem it; that thereafter he and Cunningham started downtown from his house, with the intention, as Beck understood, of Cunningham complying with his request, and of his getting the money to pay Mrs. Everard's claims. Nothing further was said, except that Cunningham went to Mr. Howat's office to consult his attorney. Cunningham did not agree to accept Beck's offer, but Beck took it that he would, because when he made the proposition both started off together to see their respective attorneys, and, as he supposed, to carry out the proposition. Upon this subject Beck testified as follows: "Q. Now, what did he [Cunningham] say on that subject, Mr. Beck? What did you say to him at that time on the subject, and what was his reply? A. Well, we had no further conversation until these papers came up. Q. No; but I mean before you left his house at that interview on the day of the sale, and an hour, or such a matter, previous to the time fixed for the sale? A. I don't recollect anything, except that I agreed to see Mr. Hall, and

he was to—he would see his attorney. He went down the street, and I went over to Mr. Hall's office. Q. Well, what did he say with reference to his agreeing to take that merely as a security? You say you had that understanding. I want you to state what he said? A. Well, I don't recollect him saying anything at that time—anything further than that we understood each other that we were going to carry out this proposition which I offered him, and that he was going to satisfy Mrs. Everard. Q. And he said that he would accept your proposition? A. I don't recollect that he said 'Yes,' or anything about it, but I took it that way. Q. Then the understanding you had was not based upon any statement of his that he would do so, that you can now distinctly recollect? A. I don't know of any conditions that is outside of—. I made the proposition, and with that proposition we started off together. Q. And you don't remember his reply? A. No. Q. But you started downtown? A. I took it for granted that we would do that. I do not know just what words he used in accepting it. Q. You took it for granted that he would do what you wanted him to do? A. Yes, sir. Q. Why did you take it for granted? A. Why, because our conversations led in that way—that we would go down together and carry out this proposition which I had made. Q. Who engaged in that conversation, and gave that indication— you or he—that that would be carried out? A. He listened, and I talked."

It does not appear that Beck gave Cunningham any writing to pay the bonus. All the parties met at Mr. Howat's office. Mr. Howat and Mr. Bradley advised Mr. Cunningham not to make the deal unless he made an absolute purchase of the stock. Beck, at that time at the office, says he asked Cunningham if he would go ahead with the deal; that Cunningham replied: "I tell you, we can not do it in the way you want it. My attorneys advise me to make an absolute sale, because there will be creditors suing you, and dragging

me into court and making me lots of annoyance, and it must be an absolute bill of sale;" that he could do nothing unless Beck made an absolute bill of sale. The bill of sale was then made and signed, and the $24,500 paid by Cunningham to Mrs. Everard. Cunningham said before this that Beck would have to trust him to do what was right as a gentleman. Mr. Anderson also testified, in substance: That after the agreement was signed Cunningham told him he had made arrangements to loan Beck $25,000 on the remainder of the 51,000 shares of stock after the three mortgages would be satisfied. That Cunningham showed him the bill of sale, and he read it, and, being surprised, he remarked that it was a sale absolute, and that Cunningham replied that Beck depended upon his honor; that Beck was at his mercy; that the reason the agreement was so drawn was so that Beck's creditors would have no claim upon the stock. Judge Hall testified: That he was present in Mr. Howat's office, as Beck's attorney, at the time the bill of sale was made. That all the parties were present, and that the papers he had drawn up for an option were refused by Cunningham. That both Mr. Howat and Mr. Bradley declared in the presence of Beck and Cunningham that the sale of the stock must be an absolute and unconditional one, or Mr. Cunningham would have nothing to do with it. Mr. Bradley said Beck knew his friends. That Beck replied that Cunningham was his friend, and that he would sign the bill of sale. Mr. Young gave testimony to the effect that he had talked with Mr. Cunningham several times, in which conversations he said that the amount of the debts secured by the stock and paid by Barnett was about $284,000, and that any time Beck would pay him back the money advanced he would return him the stock. Mrs. Everard stated, among other things: That she had a judgment execution against Beck. That the sale under the execution was to come off at 12 o'clock noon. Beck paid her $500 to extend the time of the sale four

hours, and until he could arrange with Cunningham for the payment to her of $24,000.

Mr. Howat and Mr. Bradley, in behalf of the defendants, testified, among other things, to the effect: That the parties were all at their office. That Cunningham told Beck he would not give him any right to redeem the stock; that, if the deed was made, the stock must be given to him absolutely. That Cunningham said: "This is a new thing you have sprung on me, and I have consulted my lawyers about it, and they have advised me not to have anything to do with it unless I get the property absolutely." That Beck said he thought Cunningham ought to give him the right to redeem the property, and Howat told him he could not do it, because they had advised Cunningham to have nothing to do with it unless the sale was absolute. That Beck said he wanted no contract, but wanted an understanding. That Howat said, "No; there must be no understanding of that kind, and it must be understood that there is to be no right of redemption whatever, and that the property must pass to Cunningham absolutely and unconditionally;" that the stock was a risky thing to buy, etc. Mr. Cunningham declined to make the deal unless the stock was absolutely sold to him. Mr. Bradley said that Beck and Cunningham were friends, and that he could see no reason why Cunningham would not give Beck the preference if he was willing to pay as much as any one else for the stock in the future. The bill of sale was thereafter signed, without any conditions or reservations, and Mr. Cunningham paid over the $24,500 to release the stock. Mr. Cunningham testified, in substance, denying the statements of Beck and Anderson. He states: That Beck was indebted to him in the sum of $17,500. That Beck came to his house and offered him a bonus of $15,000 if he would pay off the Everard claims of $24,000 and take his (Beck's) equity in the stock as security for that amount, including his two notes, giving b     right to redeem within six months. That he declined  he offer,

saying that he did not have the money to loan, and that he felt the stock was already hypothecated for all it was worth, and that he would not loan the money on it. That on the day of the sale Beck again saw him at his house, and asked him to do something for him, and give him six months to redeem. That he told Beck if he did anything he must make an absolute transfer of the stock, without any reservations. That he told Beck he would not consider his offer of $15,000, or for any other sum. That Beck finally said he believed he would transfer his equity, "and I then went to Howat's office. All the parties were there, including Mr. Beck and Mr. Beck's attorney." That Mr. Hall (Mr. Beck's attorney) wanted six months to redeem. That he (Cunningham) said, "no." That Mr. Howat and Mr. Bradley both said no time could be given to redeem; that it should be an absolute sale or nothing. And that he (Cunningham) made the same statement. That Mr. Beck agreed to the absolute sale, and signed the papers, and he (Cunningham) paid over to Mrs. Everard the sum due her. That the bill of sale was delivered to him. That the Bullion-Beck stock was worth $3.25 per share. That no secret agreement was made with Beck. That a month or so later Beck said he would like a chance to buy the stock back. That he said to Beck, "Go ahead, and, if you can find a party to handle the stock," that he would let him know about it. That after this Beck thought he could handle it, and he (Cunningham) told him if he would repay him the price he had paid, and his two notes, together with $7,000 for his trouble in the matter, making in all $50,000, he could have his equity in the stock. That Beck said he was satisfied with the offer, and that he could sell at that price. That he (Cunningham) never told Beck that his creditors would bother him if he gave an option. That in September he wrote to Beck, telling him that the option to purchase the stock at $50,000 had expired. That Beck saw him later and wanted a longer time, and that he

gave him to the fifteenth of September, and on the seventeenth he wrote to Beck, telling him that he could not give him any longer time. That he then settled with the trustee, and paid off the obligation against the stock. That he paid $220,000. That the reference made by Mr. Anderson concerning what he (Cunningham) said about the loaning of the money on the stock did not occur. That his statement must have referred to a loan of $16,000 to Beck, of a previous date, and not to the purchase of the stock in question. That he never stated to Anderson that he had made a loan to Beck on the stock. That he never showed him a bill of sale. That he told him the sale was an absolute purchase. That a considerable time after the sale Anderson asked him if he was going to give Beck a chance to redeem, and that he told Anderson that Beck had no right to redeem; that he had given him a chance to purchase the stock subsequent to the time of his (Cunningham's) purchase, but that Beck had not done so. That the conversation Mr. Anderson states occurred at the gate did not take place. That he has since sold a part of the Bullion-Beck stock at $4.25 a share. That the Indian Creek stock is worth about $5,000. George Q. Cannon, H. B. Clawson, J. F. Smith, and W. S. McCornick testified, in substance: That, when Beck resigned as president of the Bullion-Beck Mining Company, he requested that Mr. Cunningham be elected in his place. That at this time, in answer to questions from Mr. Cannon, Beck said that he had sold his stock to Cunningham. Mr. Cannon asked Beck if the sale was an absolute one, or one for convenience, and Mr. Beck replied that the sale was an absolute one, and requested that Cunningham be elected a director in his place. Mr. Hyde testified, in substance, that Beck told him in July, after the sale, that Cunningham had given him a chance to buy the stock at $50,000, which included the price paid, and $17,500 in notes held by Cunningham against Beck. The bill of sale of the stock was offered in evidence, showing an absolute sale of the stock.

The above contains only a synopsis of the testimony given by the witnesses on the question of the transfer of the stock.

MINER, C. J., after stating the facts, delivered the opinion of the court.

The appellant claims that the court erred in its findings that Mr. Beck, for a valuable consideration, sold and assigned all his interest in the 51,000 shares of the Bullion-Beck stock to Mr. Cunningham, and that the sale was not made to defraud or delay Beck's creditors, nor upon any secret trust or agreement; that the stock should be held by Cunningham as security for the sum paid by him; and for the reason that the evidence is insufficient to justify the findings, etc.

1. An examination of Mr. Beck's testimony shows that he had no actual promise from Mr. Cunningham that the latter would make him a loan on the stock, and accept it as a security for the $24,500 advanced upon it, allowing Beck the privilege of redeeming it. Whatever understanding Mr. Beck may have had to the effect is not clearly derived from any statement or promise from Mr. Cunningham prior to the time of the transfer of the stock. While Mr. Beck may have been laboring under the impression that such was the case, such understanding or impression must have been dispelled at the time the bill of sale was executed. At this time not only Mr. Cunningham, but Mr. Howat, Mr. Bradley, and Mr. Hall, state very clearly that Mr. Cunningham refused to advance the money upon any other consideration than that Beck should make an absolute bill of sale of all his equity in the stock, without any right of redemption, or any understanding of any secret agreement to give him the right to redeem it. The bill of sale was signed by Beck, and the stock transferred. Mr. Hall, at Beck's request, had already drawn a writing for Mr. Beck to sign for a loan upon the stock, with a right to redeem; but all of said parties agree that this proposition was absolutely and emphatically refused, and that Mr. Beck, with knowledge

of the facts signed the bill of sale. It is true that Mr. Anderson gave testimony tending to show that Cunningham stated to him that there was an understanding between him and Beck that that transaction amounted to a loan, with the right in Beck to redeem the stock; but this testimony stands almost entirely unsupported, when considered in the light of the other testimony given in the case. It will be conceded that Mr. Anderson did not intend to depart from the truth in giving his testimony. Notwithstanding the high character of the witness, it is quite possible that he may either have been mistaken as to what was said, or as to which of Mr. Cunningham's transactions with Mr. Beck was referred to by him in giving his testimony. In any event, the great preponderance of the evidence is clearly in support of the findings made. This is more clearly emphasized when we consider the testimony of Mr. Cannon, Mr. Smith, Mr. Clawson, and Mr. McCornick, who testify that Beck stated in the meeting of the board of directors at the time of his resignation that the sale of his stock to Mr. Cunningham was an absolute sale, and not made for convenience, but absolutely transferred his equity in the stock to Cunningham. In addition to this, the bill of sale, upon its face, shows an absolute transfer of Beck's equity in the stock. The consideration paid for it, when taken in connection with the heavy liens upon it, the complications surrounding it, and the usual fluctuations of values attaching to mining stock, and the danger ordinarily attending such transactions, must be considered reasonable, under all the circumstances disclosed. Notwithstanding the sale was absolute, the testimony shows that several weeks after it was consummated Mr. Cunningham at Mr. Beck's request, gave him the opportunity to purchase the stock on payment to him of about $7,000 more than was advanced upon it; and Mr. Beck was satisfied with the offer, and endeavored to obtain the money for that purpose, but failed to procure it within the several weeks allowed him. Thereafter additional time was granted

by Cunningham for the same purpose, but Mr. Beck was unable to induce any person to advance the desired amount to purchase it. The amount charged by Cunningham for his risk and trouble was not unreasonable, when we consider the risk and complications attending the transaction, and the further fact that Mr. Beck states that he offered Mr. Cunningham $15,000 if he would loan $24,000 upon the stock, with a right to redeem, at the time when he first applied for the loan.

2. Counsel for the respective parties discuss at length the rule obtaining here as to the effect of conflicting or evenly-balanced testimony. There is some conflict in the testimony in this case, but even if the evidence were more evenly balanced the case would still come under the rule, frequently announced, that, in cases where the trial court saw the witnesses and heard their testimony, it is better able to judge of their truthfulness and credibility than is this court from reading the testimony. As has been frequently held, we have power under the Constitution, to review questions of fact in equity cases. Still, when such cases have been regularly tried before a court of equity, and facts found on all material issues, this court will not distrub the findings, unless they are so manifestly erroneous as to demonstrate some oversight or mistake which necessarily affects the substantial rights of the appellant. We do not wish to be understood, however, that we are concluded by the findings of the trial court. We do not mean that we have abdicated our supervision and control over facts in equity cases. But when there is a great or irreconcilable conflict in the testimony, or it is evenly balanced, and the findings of the trial court are sustained by the evidence, such findings will ordinarily be sanctioned by our affirmance; but, when the testimony preponderates on one side or the other in such a way as to convince this court that the court below has erred, its judgment will be reversed. McKay v. Farr, 15 Utah 261, 264, 49 Pac. 649; Klopenstine v. Hays, 20 Utah 56, 57 Pac. 712; Whitesides v.

Green, 13 Utah 341, 351, 44 Pac. 1032, 57 Am. St. Rep. 740; Bank v. Stapp (Ky.), 30 S. W. 1000; Benne v. Schnecko (Mo.), 13 S. W. 82.

3. The purpose of this action is to set aside and annul a written instrument signed by Mr. Beck. To do this, the entire burden is thrown upon the appellant to overcome, by clear, unequivocal, convincing testimony, the strong presumption arising in favor of the written instrument signed by the party charged; and if there is a failure to overcome this presumption by testimony clear, plain, and convincing, and beyond reasonable controversy, the written instrument will be held to express the intention of the parties. The bill of sale in question speaks as an absolute conveyance, and the testimony offered to impeach it, taken in connection with the testimony of the other witnesses, is not so clear, unequivocal, and convincing, or beyond such reasonable controversy, as to convince us that it is not what it purports to be. Ewing v. Keith, 16 Utah 312, 52 Pac. 4; Chambers v. Emery, 13 Utah 374, 45 Pac. 192; Howland v. Blake, 97 U. S. 624, 24 L. Ed. 1027.

In conclusion, we find no evidence of fraud or of a secret trust, as charged in the complaint. Many other questions are raised in the record, on which we find no reversible error.

The decree and findings of the district court are affirmed, with costs.

BASKIN and BARTCH, JJ., concur.