## YODER v. UNITED STATES.
### No. 947.

Circuit Court of Appeals, Tenth Circuit.

June 4, 1934.

F. H. Reily, of Shawnee, Okl. (Joe H. Reily, of Shawnee, Okl., on the brief), for appellant.

D. E. Hodges, Asst. U. S. Atty., of Oklahoma City, Okl. (W. C. Lewis, U. S. Atty., of Oklahoma City, Okl., on the brief), for the United States.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

LEWIS, Circuit Judge.

Appellant was tried, convicted and sentenced to five years' imprisonment in the penitentiary and to pay a fine of $1,000 on an indictment which charged that on September 28, 1931, he transported Sammy Lee Young in an automobile from Shawnee, Oklahoma, to Chicago, Illinois, with intent that they would have sexual intercourse within the state of Illinois. The case is here on alleged errors in the trial proceedings.

Both parties were married at the time in question. Mrs. Young testified that she was born January 16, 1911. She was therefore twenty years and eight months old in September, 1931, although she testified that at that time she was eighteen years old. The defendant was thirty-two.

Both parties were impeached as witnesses during the trial. The defendant was convicted of stealing a gun when he was twenty-two years old and served a term in a reformatory. He also served a term in the California penitentiary for joy riding. By her own testimony Mrs. Young committed perjury.

Mrs. Young testified that she lived in Oklahoma City; she met defendant in his garage at Shawnee, Oklahoma; that she met him, and liked him, and was not satisfied with her husband, and had sexual intercourse with him a week or more later, and that continued until they started to Chicago; that they arranged to go to Chicago together, "We were going to Chicago to try to buy a garage"; that they were going up there to live together; that the first night after leaving Shawnee they slept together in Joplin (Missouri).

The defendant testified that the first time he met Mrs. Young was in his garage two or three weeks before they went to Chicago; that she came there to have some work done; that she came in again to have her car washed,

and he told her she would have to wait until the next day; that she then asked him if he knew where she could find a reliable man to go with her and her husband to Chicago to look over a garage; that they were going into the garage business in Chicago; that he told her she would not have any trouble finding men, there were many out of work, and she asked him if he would consider going, and he told her he might; that he asked her what she was willing to pay; she left that to him, and he replied that he would consider $5.00 a day and expenses, and she said, "I will see my husband and let you know tomorrow;" she drove into the garage next day and said to him, "I talked with my husband about paying you $5.00 a day and expenses to go to Chicago to look over a garage and help us buy one," and it would be all right; that he then asked her when she planned on leaving, and she said in a couple of days, if he could get off; she came back in her car on the following Monday and said she was ready to start; he asked her where her husband was, and she replied, "He will meet us in Joplin."

Defendant got ready, and they left that day. Defendant testified they got to Joplin at 9:00 or 10:00 o'clock P. M.; she said she would have to go to the Western Union and find out where her husband would be; that she went in and when she came out she said he left word he had gone on to Chicago and for them to meet him in the Washington hotel in Chicago; that he expected her husband would meet them at Joplin, and he had no thought of having sexual intercourse with her until he learned her husband was not there; that they occupied a room together that night, also the next night in St. Louis, the third night at Pontiac, Illinois, and reached Chicago the next day; that she went to the Washington hotel to inquire of her husband and reported he had not arrived; that they spent two or three days in or near Chicago with some of his friends; that while in Chicago Mrs. Young lost her purse, he did not know what was in it and never got any of her money, and had to pawn his diamond ring on return to St. Louis; that he began asking her why her husband had not arrived in Chicago, and she finally said, "Well, I am just going to tell you the truth about it, he is not coming;" on further inquiry about that she said, "My aunt and I planned to get you to bring me over here, so he didn't have anything to do with it;" that she was supposed to bring him and then if his dad did not pay them some money they could have him arrested for violating the White Slave law; that

thereupon they got their things and started back to Oklahoma. They arrived in Oklahoma the third or fourth of October. The trip was made in Mrs. Young's car.

The defendant called an attorney, who lives in Shawnee, as a witness. He testified that between the fifteenth and twentieth of September, 1931, his car had a loose bumper, and he drove into defendant's garage to have the bolt tightened; that while he was waiting Mrs. Young drove in, and he heard a conversation between her and the defendant in which she said, "I was talking to my husband about going to Chicago, and he is willing to pay you $5.00 a day and your expenses, if you will go along."

Defendant also called John Blize, a resident of Texas who was visiting his daughter near Shawnee in September, 1931. He testified that he went to defendant's garage to get a spring put on his car; he had not met defendant; there was another man present trying to sell defendant insurance; Mrs. Young drove into the garage; he had never met her, but he recognized her at the trial and was positive it was she; she wanted defendant to wash her car; he told her to return the next morning; he heard her ask the defendant where she could get a reliable man to go to Chicago; that she and her husband were going to buy a garage; that they knew nothing about the garage business and wanted someone to go with them; he told her there were plenty of men around wanting work, and she asked him if he would consider going; he asked her what they would pay, and she said she didn't know; he told her he would charge $5.00 a day and expenses, and she said, "Well, I will let you know in the morning, if it is all right with my husband it is all right with me." This witness was in Oklahoma from the fifteenth to the twenty-fifth of September and returned to Texas.

L. L. Hackett, who had been in the insurance business at Shawnee for eighteen years, testified that in September, 1931, he went to defendant's garage to talk with him about health and accident insurance; that while he was talking to defendant Mrs. Young drove in in a car and asked defendant if he could wash it; he said they were busy, but he could wash it the next morning; she then asked him where she could get a mechanic to go with her and her husband to Chicago; that they were going down there to buy a garage; that neither knew anything about a garage, and defendant told her there were many idle men, and she could get plenty of them; then

she asked him if he would consider going and what he would charge; he told her he would go for $5.00 a day and expenses; she replied, "I will see my husband and see you later."

Another witness, who lived in Shawnee and worked for the Rock Island Railroad in its boiler shop, testified that he was in defendant's garage sometime in September; his car was there being overhauled; while he was there he saw Mrs. Young drive in in a red Chevrolet sedan, and heard her say to defendant, "I was talking to my husband about you going to Chicago with us, and he said he was willing to give you five dollars a day and expenses;" he replied, "All right, when are you going to be ready to go;" she said, "In a couple of days." She left her car there and walked off.

█ None of these four witnesses was impeached, and there is nothing in the record that reflects on their credibility. Although the court instructed the jury that if they believed the testimony of the defendant and the witnesses to the effect that he was employed to go to Chicago on a business trip and there was no intention at the time the two left the state of Oklahoma to have immoral relations they should find him not guilty [Fisher v. United States (C. C. A.) 266 F. 667; Alpert v. United States (C. C. A.) 12 F.(2d) 352], the court then proceeded by argument to convince the jury that the testimony of defendant and his witnesses was not to be credited or believed; that the court did not believe the testimony "of those two witnesses" (there were four); and that to believe such testimony was to ignore ordinary common sense and ordinary human nature. The court throughout its instructions referred to Mrs. Young as "this little girl," and spoke of her as "attractive and fascinating." The instructions also contain erroneous statements of the testimony. As instances, "one day she told, him she had a prospective settlement with her husband, and that the defendant urged and advised her to make the settlement," and "then when she advised him she was getting this money, that he proposed they take this trip to Chicago in order that they might live together. That is her statement." We have searched the record in vain to find such testimony. No witness testified that defendant proposed the trip or that they go to Chicago to live together or that defendant urged and advised her to make settlement with her husband. As a further appeal to the sympathy of the jury the court said: "She is a little girl who is fighting her battle alone in this matter."

But we turn to other errors equally as grave and obvious. The direct examination of Mrs. Young, the first witness for the prosecution, had hardly begun when the District Attorney made this inquiry, Whether she had a separation and settlement with her husband and how much money she got. This line of inquiry was constantly objected to by the defendant and the objections uniformly overruled. She testified that her husband gave her $2,000 in cash in $20 bills; that the $2,000 was in the car when they left Shawnee for Chicago; that after reaching Chicago she gave the $2,000 to the defendant to keep, and when they were ready to leave he claimed he had lost it. The District Attorney by leading questions and over objection sought to have her say that defendant took it from her custody and control, but she replied, "Well, I let Roy carry my money for me and he claimed he lost it." She said he never gave the money back and she never made an attempt to blackmail him. This brought before the jury a subject wholly foreign to the issue, that·is, the charge in the indictment and the plea of not guilty. That testimony was given a wide range over defendant's objections. So much so that the court early in its charge said, "The offense charged is much narrower than the evidence in this case. * * * Most of the testimony in this case has been about the $2000 instead of the offense charged, * * *". Thereafter the court had much to say in its instructions on that subject.

Soon after the return from Chicago Mrs. Young sued the defendant and his father in a state district court for this claimed $2,000. Thereafter she went into that court and asked leave to dismiss that suit. The judge of that court testified in this case. He said:

"I remember the case of Sammy Lee Young against Roy Yoder and W. W. Yoder pending in my court. I don't remember in detail what she testified to regarding the money she was suing for, but the purport of her testimony was that the allegations of her petition were not true; not founded on any facts. She said that she did not go to Chicago with Roy Yoder for any immoral purpose."

On cross-examination in this case these questions were put to her and answered as follows:

"Q. You know Judge Hal Johnson, judge of the district court of Pottowatomie County, don't you?

"A. Yes, sir, I do.

"Q. I will ask you if on the afternoon of the 20th day of December, 1932, in Case Number 14,386, entitled Sammy Lee Young against Roy Yoder and W. W. Yoder, defendants, if you didn't testify after Judge Johnson had sworn you that you didn't have any money in Chicago?

"A. Yes, sir, I did.

"Q. And if you didn't testify that Roy Yoder never got any money off of you in any way or that you didn't give him any money?

"A. Yes, sir.

"Q. And didn't you also testify in answer to Judge Johnson's question that you never left Shawnee or Oklahoma for any immoral purposes with Roy Yoder?

"A. I don't remember whether I said that or not.

"Q. And if you didn't testify that you agreed to pay Roy Yoder five dollars a day to look over a garage in Chicago for you?

"A. I don't remember. I might have said that.

"Q. Weren't you asked this question: 'Did your aunt, Mrs. Campbell, and your other aunt take you over in these other states' and didn't you answer that 'They planned it and they thought I would carry it through?'

"A. I don't remember what I said.

"Q. Do you remember telling Mr. W. W. Yoder that your two aunts framed this?

"A. My two aunts never had anything to do with it. Roy wanted me to say that.

"Q. Did you tell Mr. Yoder that your two aunts framed it?

"A. Yes, sir, I did, but it isn't the truth."

The defendant's father was a witness. He testified that Mrs. Young and her aunt Mrs. Kendall came to his office in Shawnee, after the return from Chicago, and that Mrs. Kendall demanded $2,000 of him, which she reduced to $1,700, to keep her from prosecuting his son; that she said he could take his choice, pay the money or his son go to the penitentiary; that he said he couldn't pay them, the bank was closed; that they said they would come back next morning; that Mrs. Young came back next morning, but her aunt was reported to be ill and didn't come; that Mrs. Young said she came after the money but didn't want it; that this was all framed by her two aunts; that he asked Mrs. Young if it was a frame-up to blackmail him, and she said, "Yes it is;" that she was going back and tell her aunt Mrs. Kendall that she wasn't going to carry it out. A few days later Mrs. Young and Mrs. Kendall came to his

office again. He asked Mrs. Kendall if he paid would she guarantee that the boy would not be prosecuted. She said she certainly would. A receipt, offered and admitted in evidence, was then drawn up and signed by Mrs. Kendall, but the record is silent as to whether Yoder paid her the $1,700. The receipt is this:

"State of Oklahoma, Pottawatomie County, ss.

"I, the undersigned, herewith acknowledge receipt of the sum of Seventeen Hundred ($1700.00) Dollars from W. W. Yoder. The payment of said money to me by the said W. W. Yoder is for the purpose of preventing me, my sister, Mrs. Long, and my niece, Samuel Lee Young from prosecuting Roy Yoder for white slave traffic in which my niece Miss Young and Roy Yoder, went to Kansas and other states for immoral purposes.

"I agree with Mr. Yoder that we will not prosecute Roy Yoder for said offense and the payment of said money settles the entire transaction.

"Witness my hand this 8th day of October, 1931.

"Maud Kendall."

W. W. Yoder further testified that Mrs. Young told him that her husband had the $2,000; that he got drunk and she got the $2,000 off of him and put it in her bosom and that he came in and demanded the money and got hold of her and tore her clothes off and got the $2,000; that it was scattered around the floor and while they were wrestling around about it several bills got under the carpet, and she got those and he got the rest; that she had a small amount of money when she went to Chicago. Mrs. Young denied on cross examination this testimony given by W. W. Yoder. Mrs. W. W. Yoder corroborated her husband in testifying that Mrs. Young said she took $2,000 from her husband when he was drunk, that the latter tore her clothes and took the money from her, that some of it got under the carpet and she got that, but he got the rest.

Mrs. Maud Kendall testified in rebuttal. She lives in the suburbs of Oklahoma City and runs a club house, "not a road house." She admitted she went to see W. W. Yoder, and saw him and his wife; that she didn't demand $2,000 of Yoder, but asked him to give Sammy Lee Young's money back to her. Mrs. Yoder testified that Mrs. Kendall didn't make any claim that the money was due to Mrs. Young.

Mrs. Young testified in rebuttal that she

never was at the Washington hotel in Chicago, never went to the Western Union office at Joplin, never told defendant that her husband would meet them there, and never saw two of defendant's witnesses who testified to the conversations between her and defendant in his garage.

After all of the evidence was in defendant's counsel moved to strike all evidence with reference to the $2,000. The motion was overruled. The only reason assigned by the court for letting in that evidence was, "It is competent merely as going to the credibility of the witnesses. It is not an element of the offense." Clearly this evidence was prejudicial and incompetent. It had no tendency to prove the offense charged, and was in no manner related to that offense. A witness may be contradicted only in matters that are relevant to the issue. Wharton on Criminal Law (7th Rev. Ed.) Vol. I, §§ 814, 817; 2 Best on Evidence, Morgan's Ed., § 644; 1 Greenleaf on Evidence (15th Ed.) § 462; Haussener v. United States (C. C. A. 8) 4 F.(2d) 884; Coulston v. United States (C. C. A. 10) 51 F.(2d) 178.

The court more than once told the jury in its instructions that they could believe such testimony as they desired to believe, or ignore it; that it was entirely up to them. It used that language in commenting on the testimony of the four witnesses of defendant as to conversations between Mrs. Young and defendant in the garage. It also used that language broadly as to all of the witnesses. That is not the law. It is the duty of the jury, and it ought to be instructed that it should consider dispassionately and fairly the testimony of each and all the witnesses, and that they cannot arbitrarily ignore the testimony of any witness unless they believe he knowingly and wilfully testified falsely. The District Judge early in her examination asked Mrs. Young if her testimony was the same as the testimony she gave when she was before the grand jury. She answered, "Yes, sir, it is." This was error. The testimony of a weak or discredited witness cannot be thus bolstered. Jones on Evidence (2d Ed.) Vol. 6, § 2456; Ellicott v. Pearl, 10 Pet. 412, 438; Connor v. People, 18 Colo. 373, 33 P. 159, 25 L. R. A. 341, 36 Am. St. Rep. 295; Baker v. People, 72 Colo. 68, 209 P. 791; De Priest v. People, 64 Colo. 358, 171 P. 1004; Ewing v. Keith, 16 Utah, 312, 52 P. 4; Builders' Supply Co. v. Cox, 68 Conn. 380, 36 A. 797; James v. State, 115 Ala. 83, 22 So. 565.

Reversed and remanded.